UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILLIAM McGEE and LEE McGEE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CONSTANT CONTACT, INC., GAIL F. GOODMAN, HARPREET S. GREWAL and JEREMIAH SISITSKY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:15-cv-13114-MLW<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff North Collier Fire Control and Rescue District Firefighter Pension Plan ("North Collier," "Plaintiff," or "Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendant Constant Contact, Inc. ("Constant Contact" or the "Company"), Gail F. Goodman ("Goodman"), Harpreet S. Grewal ("Grewal"), and Jeremiah ("Jerry") Sisitsky ("Sisitsky") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included: (a) review and analysis of public filings made by Constant Contact with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications by other related non-parties concerning Constant Contact; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Constant Contact; and (e) interviews with former employees of Constant Contact ("FE"). Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities fraud class action against Constant Contact and certain of its former officers and directors for violations of the federal securities laws. Plaintiff brings this action on behalf of itself and all other similarly situated persons or entities, who purchased the publicly traded securities of Constant Contact between July 25, 2014 and July 23, 2015 ("Class Period") and who were damaged thereby ("Class"). This action seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.    Defendant Constant Contact is a provider of digital marketing solutions to small businesses, associations, and non-profit entities.   Historically known as an email marketing company, in the years prior to the Class Period, Constant Contact expanded its portfolio to include social media and event marketing products, as well as online survey solutions.  For the most part, customers subscribed to the Company's product offerings on a monthly basis.

3.    In April 2014, Constant Contact formally launched Toolkit, an online marketing platform that provided its customers with a "bundle" of the Company's product offerings.  Heralded by the Company's senior management as the "future of Constant Contact," Defendants represented to investors that Toolkit was a "game changer for small businesses" that would define "the future of small business marketing."

4.    Defendants repeatedly touted the performance of Toolkit during the Class Period. Defendants claimed, for example, that Toolkit was considerably increasing the Company's revenue growth by increasing the average revenue per user ("ARPU").  Defendants also boasted that Toolkit was improving customer retention rates, another critical metric of the Company.

5.    In reality, Defendants knew that Toolkit was a disaster.  Customers were extremely dissatisfied with the product, which was fraught with technological defects.  As one FE described the defects were  "catastrophic," causing a dramatic increase in the demand for customer support. Another FE confirmed "bugs with the product" that made it "too difficult for the average person to sign up for the product and start using."  To make matters worse, the Company hiked subscription prices to account for Toolkit, creating significant customer backlash.  By the start of the Class Period, only four months after Toolkit's launch, a substantial number of customers were cancelling their subscriptions.  By the end of the Class Period, consumer acrimony reached such a level that

Constant Contact completely abandoned the Toolkit brand, despite spending significant resources on its promotion, and broke it down into its component parts.

6.      As detailed further herein, Defendants were intimately aware of these problems with Toolkit and the negative impact on Constant Contact's business.  They admitted to closely monitoring, evaluating, and testing Toolkit during the Class Period.  For example, Defendant Goodman boasted of an "incredible amount of data" on Toolkit and that "tremendous learnings, constant testing, iterating, and refinements" enabled the Company to "understand the impact of Toolkit" and "evaluate the effects of Toolkit on different audiences."  Nevertheless, during the Class Period, Defendant Goodman falsely represented to investors that "[w]e're seeing better customer engagement, higher ARPU, improving retention rates, and increased lifetime customer revenue from Toolkit customers."

7.      During the Class Period, Defendants also took measures to mask Toolkit's failure.  Inundated with customer requests to cancel their subscriptions, Constant Contact went to great lengths to forestall customer cancellations.  FEs said they were "disgusted" with these business practices, calling them "morally wrong" and "unethical."

8.      When the magnitude of customer cancellations became too great to hide, Defendants falsely attributed them to events outside of Constant Contact's control.  Defendants blamed the cancellations on "higher than normal credit card failure rates" occurring "as a result of the highly-publicized data breaches that have impacted national retailers and financial institutions."  In truth and in fact, customers were cancelling because of the problems with Toolkit.

9.      As a result of Defendants' fraudulent scheme, the price of Constant Contact stock remained artificially inflated throughout the Class Period, reaching a high of $43.18 per share on March 4, 2015.  While in the possession of the true facts about Toolkit and its negative impact on

Constant Contact's business, Defendants Goodman and Grewal personally unloaded shares of Constant Contact stock for proceeds totaling over $6.8 million during the Class Period.

10.     By the end of the Class Period, Defendants could no longer conceal Toolkit's problems and the material negative impact on the Company's finances.  As the market began to learn the truth, the price of Constant Contact stock dropped precipitously.  On April 30, 2015, Constant Contact stunned the market by announcing lower-than-expected revenue and higher-than-expected customer attrition during the first quarter of 2015.  As a result, the price of Constant Contact stock plunged more than 21% on May 1, 2015.  Then, on July 23, 2015, Constant Contact disclosed lower-than-expected ARPU numbers and a "conscious choice" to shift the Company's focus from Toolkit, which was "largely removed from our marketing materials."  On this news, the stock price declined from $29.53 per share to $26.18 per share, or 11%, on July 24, 2015.

11.     Following the Class Period, on November 2, 2015, Constant Contact announced that it had entered into a merger agreement with Endurance International Group ("Endurance").  Under the agreement, holders of Constant Contact common stock would receive $32 per share – 26% lower than the Class Period high of $43.18 per share.

12.     Defendants' fraud has not escaped the scrutiny of federal securities regulators.  On December 15, 2015, Constant Contact revealed that it was the target of an SEC investigation.  According to the Company's disclosure, the SEC subpoenaed "documents pertaining to Constant Contact's sales, marketing, and customer retention practices, and periodic public disclosure of financial and operating metrics."  Constant Contact warned investors that it could "make no assurances as to the time or resources that will need to be devoted to this investigation, or the impact, if any, of this investigation or any proceedings on Constant Contact's business, financial condition, results of operations and cash flows."  On this news, the price of Constant Contact stock fell another

9% over two trading days, from a close of $31.65 per share on December 15, 2015 to a close of $28.69 per share on December 17, 2015, on unusually heavy trading volume.

13.     On February 9, 2016, Endurance completed its acquisition of Constant Contact paying $32 per share.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

16.     Venue is proper in this District under Section 27(c) of the Exchange Act, 15 U.S.C. §78aa(c), and 28 U.S.C. §1391(b)-(d).  Many of the acts and transactions that constitute the alleged violations of law occurred in this District.  In addition, Defendant Constant Contact maintained its principal executive offices in this District during the Class Period.

17.     In connection with the acts and transactions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of the NASDAQ Global Select Market (the "NASDAQ"), a national securities exchange.

## III.    PARTIES

### A.     Plaintiff

18.     Lead Plaintiff North Collier is a public sector, defined benefit pension plan providing retirement, disability, and death benefits to firefighters employed by the North Collier Fire Control

and Rescue District in the State of Florida.  As set forth in its certification previously filed with this Court [Dkt. No. 14-3] and incorporated by reference herein, Lead Plaintiff purchased Constant Contact common stock during the Class Period and suffered damages.

### B.     Defendants

19.     Defendant Constant Contact is a provider of digital marketing solutions.  During the Class Period, the Company maintained its principal executive offices in Waltham, Massachusetts and its common stock is traded on the NASDAQ exchange under the ticker symbol "CTCT."

20.     Defendant Goodman served, at all relevant times, as Constant Contact's President, Chief Executive Officer ("CEO"), and Chairman of its Board of Directors, a position she held from April 1999 through February 11, 2016.

21.     Defendant Grewal served, at all relevant times, as Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer of Constant Contact, a position he held from July 6, 2010 through January 2016, after which he transitioned to General Manager of the Company.

22.     Defendant Sisitsky served, at all relevant times, as Constant Contact's Vice President of Investor Relations.

23.     The Defendants referenced above in ¶¶ 20-22 are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants and Constant Contact are collectively referred to herein as "Defendants."

24.     Because of the Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, and attendance at management and/or Board meetings and committees.

25.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  In addition, Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26.     As officers and controlling persons of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded stock would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC

filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

28.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Constant Contact common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Constant Contact's financial performance, business, products, operations, management, and the intrinsic value of Constant Contact common stock; (b) enabled the Individual Defendants to sell over $6.9 million of their personally held Constant Contact common stock to the unsuspecting public at artificially inflated prices; and (c) caused Plaintiff and the Class to purchase Constant Contact publicly traded stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

29.     Defendant Constant Contact is a leading provider of online marketing tools that are designed for small organizations, including small businesses, associations and non-profits.

30.     The Company's flagship products are email marketing tools that allow small organizations to create, send and track professional and affordable permission-based email marketing campaigns. In addition to email marketing tools, Constant Contact provides social media marketing, event marketing, local deals and survey products. Finally, the Company acquired

SinglePlatform, a company that helps small businesses get discovered through web and mobile searches by providing a single place to update important business information, a "digital storefront."

31.     Constant Contact also provides free unlimited customer support to all customers and trialer (*i.e.*, people who signed up on a trial basis) of its products via phone, chat, email and social media.   In addition to the live customer support access, the Company also provides free daily product tours offered via Constant Contact's website, a knowledge base of frequently asked questions, and webinars that explain the benefits of engagement marketing.

32.     The Company markets its products and acquires customers through a variety of sources including online marketing, such as search engines and advertising on online networks and other websites, offline marketing through television and radio advertising, local seminars, relationships with its partners, referrals from its customer base, general brand awareness and a link to the Company's website in the footer of substantially all of the emails sent by its customers.

33.     Historically, each of the above-referenced products could be purchased via monthly, semi-annual, or annual subscriptions, and were offered on an individual basis to customers.   For example, a small business looking for an email marketing tool could visit the Constant Contact website and sign up only for email marketing.

**B.     Constant Contact Launches Toolkit**

34.     After more than six months of testing, Constant Contact launched Toolkit: "a new offering that will provide an entirely new, all-in-one product experience for small businesses and non-profits."   The Company represented that "[t]hese tests have proven to be highly successful, yielding higher average invoices with better retention rates. The results provide us with the confidence to [enroll] this offering, which we are calling Toolkit, to all new customers in the coming weeks."   Toolkit was extolled as the "future of Constant Contact," calling it a "game changer for small businesses" that would define "the future of small business marketing."

35.     In announcing the launch during the 1Q 2014 Preliminary Earnings Conference Call, on April 8, 2014, Defendant Goodman described the launch as a "major milestone" stating, in pertinent part, as follows:

> The launch of Toolkit represents a major milestone in the evolution of Constant Contact from an email marketing company to so much more. Our transformation will have multiple phases, commencing with the introduction of Toolkit to new customers only, followed by the migration of our existing customer base over time. Along the way, we will continue to test and iterate as we become more proficient at selling product bundles and a new, higher-priced package.

36.     Constant Contact offered Toolkit in three different packages: Basic, Essential and Ultimate, and was tiered within each package. As the Company explained it, "[t]his approach allows for differentiated bundles to meet the various needs of our customers and provides us with a two axis pricing model with multiple ways in which we can drive [ARPU]."  The Basic package starts at $20 a month, which was near the Company's pricing for its e-mail marketing product.  The Essential package started at $45 a month.   The Ultimate package included a dedicated account manager/marketing consultant to help customers maximize the benefits of Toolkit and ranged between $195-$700 a month.

37.     Though the Company continued to service and sell its standalone products to existing customers, Toolkit – at least initially – would be "the only offer" that new customers would see.

**C.     The Company Highlighted the Success of Toolkit**

38.     During the Class Period, Constant Contact provided glowing reviews on the progress and success of Toolkit.  For example:

<u>July 2014</u>

> We are pleased with the customer response, and continue to test and iterate our way into optimizing Toolkit. Providing value to our customers, and ensuring their success is our chief priority.

- 10 -

October 2014

Let me begin with an update on Toolkit, which continues to perform well. We're seeing better customer engagement, higher ARPU, improving retention rates, and increased lifetime customer revenue from Toolkit customers. As we mentioned on the last call, we're iterating rapidly to refine the positioning, selling, onboarding, and product experience to maximize customer success and lifetime customer value. Like any significant product introduction, it will take time to fully settle into the repeatable model of the new product cycle. At this point, there are tremendous learnings, constant testing, iterating, and refinements.

January 2015

The launch of Toolkit in April, represents a game changer for small businesses and non-profits. We believe Toolkit defines the future of small business marketing.

*     *     *

Toolkit continues to perform well. Customer engagement is increasing, ARPU continues to show strength, and retention rates are showing marked improvement. All of which is helping drive higher customer lifetime value.

39.     Further, throughout the Class Period, the Company consistently reported positive increases in its ARPU and attributed these increases to Toolkit.  For example:

July 24, 2014

- As in the prior quarter, we saw record gains in ARPU, which increased $3.34 or 8% year over year to $44.40, the largest year-on-year ARPU increase in our history.

October 23, 2014

- ARPU increased $3.49 or 8% year-over-year to $44.89, consistent with our expectations. Based on September and October results, we are on pace to deliver ARPU in the fourth quarter in the $46 to $47 range. **ARPU acceleration will be driven by the gains delivered by Toolkit and one of our seasonally stronger quarters, pricing refinement and tests to better accommodate migration of existing customers to Toolkit, and continued momentum in single platform where ARPU continues to grow by multiple dollars each month**.

January 29, 2015

- ARPU showed record growth, increasing to well over $46 a month, a 10% year-on-year increase.

40.     By the beginning of the Class Period, however, Defendants knew or recklessly disregarded that the marketplace was rejecting Toolkit and customers that did subscribe to Toolkit quickly cancelled.

**D.     Technological Issues with Toolkit Substantially Increased Demand for Customer Support Taxing the Company's Resources**

41.     Unbeknownst to investors, Toolkit was beset by technological defects that increased the demand for customer support and caused customer support response time to rise to unprecedentedly high levels.

42.     FE 1, a former Billing Manager employed in different capacities with the Company from 2011 until 2016, explained that when Toolkit was first introduced, visitors to the Constant Contact website were either directed to the Company's historical website interface or the new Toolkit interface.  Those that were directed to the Toolkit interface ultimately rejected it, finding it to be "very buggy" and "broken in every way, shape and form."

43.     FE 2, a former Manager of Customer Service, confirmed that there were "bugs with the product," such as Toolkit's Event Planner program, "it became too difficult for the average person to sign up for the product and start using."  As part of his[1] responsibilities, FE 2 supervised a team of 10-to-12 Customer Support Representatives in the Waltham, Massachusetts call center.  His team handled all customer service relating to technical and user issues.  Management level employees of the Customer Service and Billing departments participated in regular Monday morning customer service meetings.  It was in one of these meetings where FE 2 learned that the cancellations were moved out because it was known internally that the Company was not going to meet their revenue or cancellation/retention goals for the year.

---

[1]     All former employees are identified in the masculine to protect their identities.

44.     FE 1 stated that the technological defects associated with Toolkit "dramatically, dramatically increased" the demand for customer support.  According to FE 1, where prior to the Toolkit launch, Constant Contact maintained a 12-hour customer support response time, after the launch of Toolkit, the influx of Toolkit questions and complaints caused the customer support turnaround time to spike to "9 days, just to respond to the influx of questions and complaints and inquiries about the new interface."  Toolkit "caused major, major issues on the support side of things.  It was catastrophic, and I don't use that term lightly.  It caused major issues."

45.     FE 2 confirmed that the defects with Toolkit caused customer support to become overtaxed: "customers would sit on the phone for a long, long time you know, it wouldn't be unusual to be on the phone for an hour, to get your call answered.  So you cancel, you're like, this is ridiculous."

**E.     Customers Were Unwilling to Accept Higher Subscription Prices for Toolkit**

46.     In addition to technological defects associated with Toolkit, customers were unwilling to accept the higher subscription prices associated with the Toolkit offering, causing many of the Company's customers to cancel their subscriptions due to the price increases.

47.     FE 3, a former Billing Supervisor employed with Constant Contact from 2005 until 2016, stated that, during 2014, Constant Contact changed the pricing structure on customer accounts that possessed more than 10,000 business contacts.

48.     According to FE 3, the new pricing structure caused a significant number of customers to cancel their subscriptions with the Company, explaining, "we took them from a $75.00 price point out to a $195.00 price point and there was a lot of backlash from our customers."

49.     FE 4, a former Senior Engagement Specialist in the Customer Service department employed with Constant Contact from 2012 until 2016, stated that many customers became upset

when Constant Contact implemented price increases during 2014 to mirror those associated with Toolkit. During his employment, FE 4 reported to different managers, including FE 1, Holly Scott, Kevin Collins, Kerry Wolf, Christina Gallegos, and Eric Anderson, who would, in turn, interact with the Company's CEO and CFO. According to FE 4, Billing and Customer Service reported to the same senior management. FE 4 attended monthly and quarterly meetings with his direct manager and other members of his team (consisting of a manager, a direct report manager or team lead, and a senior engagement specialist who worked directly with that manager to run the team).

50.     FE 5, a former Online Marketing Consultant (Sales) employed with Constant Contact from 2013 until 2016, also stated that many customers did not like Toolkit's pricing structure, which forced customers to purchase products they did not want. He noted that sales declined after Toolkit was released: it was a "much harder sell" and "[e]veryone's sales went down."

51.     Likewise, FE 6, a former Sales Manager employed with Constant Contact from 2011 until October 2015, stated that Toolkit was much more difficult to sell because, as FE 4 agreed, its bundled offerings had too many features, many of which the customers did not want or need.

**F.     During the Class Period Customer Cancellation Requests Skyrocketed**

52.     As a result of the technological issues and higher prices associated with Toolkit, Constant Contact experienced a substantial increase in customer cancellation requests during the Class Period.

53.     As FE 4 explained, the requests for cancellations began soon after Toolkit's launch due to customer dissatisfaction with Toolkit. FE 6 stated that, after Toolkit was released, cancellations "spiked" to the point that Company personnel were having difficulty "keeping up with the amount of [customers] that were leaving."

54.     In fact, while the Company's billing department was initially responsible for processing customer cancellations, the burgeoning requests by customers to cancel their subscriptions caused the Company to create a special customer retention team in its Waltham, Massachusetts office in late 2014.

**G.      Defendants Falsely Represented that Rising Customer Cancellations Were Due to the Credit Card Failure Rate or the Computer Chip Technology**

55.     During the Class Period, Constant Contact employed practices designed to mask and conceal the magnitude of customer cancellations and falsely and misleadingly attributed them as being associated with credit card issues as opposed to the myriad problems the Company was experiencing with Toolkit.

56.     For example, on July 24, 2014, the start of the Class Period, Constant Contact first began reporting, "higher-than-expected attrition rates," but attributed these figures, "in large part," "to an increase in the credit card failure rate, or, to put it more simply, not being able to successfully charge a credit card on file after multiple attempts."   In truth and in fact, the rising attrition rates were due to the problems with Toolkit.

57.     Throughout the Class Period, Defendants repeatedly made materially false and misleading statements attributing the poor retention rate (*i.e.*, the increase in customer cancellations) to credit card related failures.  For example:

July 2014 (2Q 2014)

- After speaking to our credit card processor, we believe this to be an industry-wide trend likely related to credit card breaches at large retailers late last year.  These well-publicized events resulted in an abnormally high issuance of replacement credit cards, which appears to be increasing the rate of credit card failure.  We are seeing some improvement, but remain cautious until we see trends return to historic levels.

- [W]e think it cost us a couple of thousand cancellations or attrits because after some point we cancel the account or suspend it. And we estimate it cost

us about $1 million of revenues in 2014.  We talked to our credit card processor.  They are seeing this trend in the industry.  They think it's linked to some of the credit card breaches that you had with companies like Target, where there's a lot more replacement cards that are being sent out.  So there are a lot more numbers we don't have in our system.  And we've been able to localize it to even the three institutions where we're seeing the biggest challenge.  It's Wells Fargo, it's JP Morgan Chase, and one other – a Canadian bank that's escaping me right now.

October 23, 2014 (4Q 2014)

- We continue to experience higher-than-expected credit card failure rates which negatively impacted Q3 revenue by $150,000 to $200,000.  We have been working with our credit card processor and will look to take advantage of more advanced tools in the coming months, which we believe may mitigate the recent impact.

- We continue to experience higher attrition continued to be buffeted on the margin by higher than historical levels of credit card failure rates.

January 2015 (1Q 2015)

- Retention rates for the year were within the historical band of 97.8%, plus or minus 50 basis points.  However, in absolute terms, attrition rates inched up a bit in 2014.  Primarily as the result of the impact, as I've talked about in the past, of the credit card failure rate.  We are aggressively working to improve on these retention trends.

58.     To assuage any investor concerns, Constant Contact made various efforts to reverse the rising attrition rates.  For example, having identified that trend in earlier quarters, on July 24, 2014, the Company stated that it had hired a new executive from Google "to focus on customer success and retention" and to work with the Company's analytics team to "create programs that can intercept you before you think of leaving because we think you are really likely to leave.  And so, I think there's a real opportunity there."

59.     Throughout the Class Period, Constant Contact continued to extoll its vigilance and efforts to turn the tides, despite the continued demise in retention.  For example:

<u>2Q 2014</u>

- While customer additions and ARPU growth were consistent with expectations, we did experience higher-than-expected attrition rates in the quarter.

<u>3Q 2014</u>

- In retention, we've really been very effectively using big data and analytics to understand pockets of opportunity to drive retention.

- We have been working with our credit card processor and will look to take advantage of more advanced tools in the coming months, which we believe may mitigate the recent impact.

- We continue to refine our internal processes, implementing call-out plans to those customers, and look to work with our processor to take advantage of new tools that should help mitigate the impact [of the higher-than-historical levels of credit card failures].

<u>4Q 2014</u>

- And while we've been buffeted by retention trends related to credit card failure, we are aggressively tackling those. And beyond just credit card failure, think we're going to be able to move the needle on retention. So I think there's an underlying foundation that is quite strong.

- [U]nder the leadership of [the new hire] at Constant Contact, who came on in 2014, we're really putting significant efforts in terms of driving those elements that we think will create underlying improvements in retention. So we're pushing on those and that, and we've seen results there. And that gives us confidence in terms of improving retention.

60.     Regardless of the admittedly declining retention rate, Constant Contact represented that, as a result of its efforts, "there is a high degree of confidence on the underlying gains in retention that we'll make, and that we'll be available to reverse these trends partially on the credit card failure side."

61.     During the Class Period, Defendants changed the specific issue concerning the alleged "credit card failures." Early in the Class Period, Defendants falsely represented that credit card failures resulted from the issuance of new card numbers to customers when security breaches

occurred at retailers such as Target Corporation and/or The Home Depot.  Later in the Class Period,

Defendants falsely represented that customer cancelations were due to credit card failures resulting

from cards issued with newly embedded computer chip technology.  The truth was that Toolkit was

the primary reason for rising customer cancellations.

62.     FE 4 stated that he never received a call from a customer whose account was

impacted by security breaches at other retailers, *i.e.*, Target Corporation and/or The Home Depot,

and problems with chip-embedded credit cards was "never an issue."  In fact, FE 4 stated that when

Constant Contact did experience credit card failures, credit card companies would update customer

card information with Constant Contact so that, for those accounts, new replacement cards would

automatically be billed on behalf of the Company:  "We had direct capability with the banks of

updating those cards."  Further, FE 4 noted that credit cards with embedded computer chip

technology were not an issue because Constant Contact did not use a physical card reader when

billing customers.

63.     FE 1 confirmed FE 4's statements, reiterating "in most cases the system literally

updated the number or billed the correct account."  FE 1 stated Visa and MasterCard recognized an

on-going monthly payment history and updated the account to prevent service interruption.  FE 1

noted, "it was rare that [a credit card failure] actually interrupted service, I've seen it on multiple,

multiple occasions where the card would just keep getting charged, Visa or MasterCard would direct

it to the correct account because they have seen previously that it was a reoccurring charge."

64.     FE 1 also echoed FE 4's sentiments with respect to the Company's representations

that embedded computer chip technology caused customer cancellations, calling the claim

"preposterous" and "completely false from my perspective."  "I can tell you from my personal

experience, this is after interacting with tens of thousands of customers in my time there.  And that's,

that's not an exaggeration it's literally tens of thousands of customers.  Never once has a chip reader

been an issue, cause it's all virtual.  You're not swiping a card, you're not inserting a card, you're

just simply typing the numbers on the card."

65.     FE 1 stated the Company's representations that embedded computer chip technology

caused customer cancellations "is completely false from my perspective.  Never once have I seen

that being an issue, and that's, that's coming from a Billing Manager.  I never once seen that being

an issue, and like I said, I interacted with tens of thousands of customers."

**H.     Constant Contact Manipulated Cancellations to Keep Retention Rate
        High**

66.     In addition to making materially false and misleading representations about the true

nature of customer cancellations during the Class Period, Defendants caused Constant Contact to

employ various deceptive strategies to delay and artificially minimize the magnitude of customer

cancellations.

67.     According to FE 3, the Company was able to report favorable customer retention

rates "because of our manipulation."  FE 3 explained that near the end of a quarter, the Finance

Department called meetings and informed billing personnel not to cancel a certain number of

customer accounts and offered them extra compensation if they did not cancel a targeted number of

customer accounts.

68.     In order to manipulate the actual number of cancellations, the Company:   (a)

intentionally delayed customer cancellations; (b) issued "credits" to accounts of customers seeking

to cancel their subscriptions so that they would appear as being active; and (c) misused the

Company's so-called "suspend program," which allowed seasonal and other customers to

temporarily suspend their subscriptions.

69.     As FE 3 explained, "when any customer called in to cancel their account, [Constant Contact] would push the cancellation date out a month, sometimes two months and basically tell the customer that what we were doing was offering them an extended period of time." FE 3 stated that Constant Contact would "push the cancellation date out to make sure that it wasn't going to impact those quarter numbers," which, as FE 3 stated, allowed Constant Contact to manipulate customer attrition numbers.

70.     These representations were confirmed by other former Constant Contact employees. FE 4 stated that near the end of 2014, his group was instructed in a weekly meeting that he attended with other managers to ignore customer cancellation requests until 2015. FE 4 noted, people on the billing team were instructed by "senior management" "that we were not fully cancelling accounts until the end of the [2014] year to boost revenue numbers for that year. That was near the end of 2014 like the last three or four months that somebody would call to cancel, we would basically schedule their cancelation to be effect in your January, February [2015] time frame depending on when they were canceling." FE 4 explained that in late 2014 Constant Contact was able to delay cancellations by adding free monthly subscriptions to customer accounts.

71.     Similarly, FE 1 stated, "a member of Senior Management" told him that "they purposely kept accounts active until the next year [2015] to artificially inflate the numbers." FE 1 continued, "[w]e dealt a lot with [customer] attrition and retention [issues and] I got a pretty good look at their business practices, and I have to say, I was pretty disgusted with them. Morally they felt wrong in a lot of ways." FE 1 explained that the Company engaged in this practice to make the customer "retention rate [appear] much, much, better than it actually was."

72.     Likewise, FE 2 stated that in the late summer/fall of 2014, Constant Contact began pushing out customer cancellations to report favorable customer retention related numbers. FE 2

noted that his staff was instructed to offer cancelling customers extended subscriptions free of charge. FE 2 stated he was told in weekly meetings attended by management-level employees to push out customer cancellations. "Basically it came down to we have to make it look better for the stock price, that's what the discussion was; so we are going to push out all the cancellations by a month and tell customers we are doing it as a thank you for being a loyal customer, we're going to give you an extra free month . . . when it got towards Christmas [2014], it was a Christmas special and then after Christmas they just kept doing it."

73. By late 2014 and early 2015, the number of customers requesting to cancel their subscriptions reached a point that Constant Contact began applying credits to customers seeking to cancel their subscription, as well as manipulating the "suspend program" which allowed subscriptions to be suspended, but not appear cancelled.

74. FE 3 explained, for example, that Constant Contact would "credit customer's accounts, to keep the accounts open." He described that the Company "would take a certain block of customers [and] finance would apply credit to these accounts randomly to keep these accounts open so they wouldn't cancel." FE 3 further commented, "when I opened my mouth, on several occasions about this, it being a bad business practices, and you know not meeting up to our core values and unethical, that's when things took a turn for me at Constant Contact."

75. FE 3 was involved in the creation of the "suspend" program. He explained that the "suspend program" allowed seasonal and other customers to temporarily suspend their subscriptions, which afforded customers a means of preserving their customer account data when they chose to temporarily postpone their subscriptions.

76. FE 3 noted, however, that the program became just another means to artificially inflate reported customer retention data, stating it became a "way to manipulate our numbers so

these customers wouldn't attrit [cancel] so Wall Street [would see] a different number than what was actually going on internally."  FE 3 stated that the misuse of the suspend program reached a point that employees were offered bonuses if customer accounts were placed into the suspend program. "[W]e were told [we would receive extra compensation] if we could basically, not cancel this many customers accounts, or if we could get this many accounts into suspend or keep [the accounts active] for three months."

77.     FE 1 confirmed this deceptive practice, stating, "that was a big part in their intentional initiative [to keep accounts active,] getting people to suspend their accounts."

78.     The Company discontinued many of the above-noted deceptive practices in mid-2015, which FE 3 believed to be around the time Endurance was considering its acquisition of Constant Contact.

79.     Specifically, FE 3 explained that "a lot of this stuff with applying credits and doing all kinds of stuff like that, that was very, very, very, very heavy in 2014" and that in 2015, much of the activity came to a stop:  "I want to say the beginning middle of 2015, they weren't proactively putting credits on customer's accounts anymore to keep their accounts. . . . [T]hey were saying ok, we don't need to do this anymore, . . . we don't need to be as aggressive with retention."

80.     Finally, in addition to manipulating the Company's customer cancellation and retention rate metrics as described above, the Company also engaged in a scheme to generate an increase in ARPU to legitimize its false and misleading representations that the customer adoption of Toolkit was ramping during the Class Period.  During the Class Period, Defendants falsely attributed increases in revenue and ARPU to Toolkit when they were due to these unprecedented revenue-generating actions unrelated to the adoption of Toolkit.

81.     In fact, during late 2014, Constant Contact took the unprecedented step of forcing *customer service* employees to sell the Company's offerings.  FE 4 stated that customer service personnel "never had to upsale" [sic].  However, during the Class Period, "they were forcing everybody" to sell, including those assigned to responding to customer service issues, and that employees refusing to do so started "losing their jobs."

82.     FE 6 stated that in late 2014, support staff began selling the Company's product offerings to existing customers, and FE 7, a former Senior SFDC (Salesforce) Solutions Manager employed in different capacities with Constant Contact from 2009 until 2016, confirmed that customer service personnel were obligated to upsell customers seeking customer service.  As a Senior SFDC Solutions Manager, he supported various third-party business software applications including Salesforce.com, which was used to track many different Customer Service related reporting metrics.  In addition to being used by the Customer Support side of the business, Salesforce.com was also used by the Sales Operations side of the business.  As part of his duties, FE 7 worked with Customer Relationship management software to track different customer campaigns and then report those metrics to senior management.  His data went up through his immediate managers and then to Senior Vice President of Customer Support, Ellen Brezniak.  According to FE 7, he tracked "everything," including the results of campaigns, cancellation trends, Customer Support based sales, conversions to Toolkit, service related data including average call handle times, the types of customer interactions, including telephone, computer chats and emails, and the times associated with each of those contacts.  Further, FE 7 provided that "Gail [Goodman] and senior management they always wanted to know about what the customers were saying, we pulled them a lot of data, and we sent them a lot of data.  Yeah there was definitely a direct channel for that kind of information."

83.     FE 2 explained that in late 2014 and early 2015, customer service personnel were forced to "upsell" customers that called the Company with service related issues:  "[I]f customers were calling in and they were having a problem, . . . we tried to solve their problem and also sell them an e-mail for you know, $50.00."

84.     FE 2 stated Constant Contact placed unrealistic sales quotas on his group:  "[T]hey really wanted us to push the [service] reps to sell and it was a tough conversation cause when the customers are calling in, they are calling you with a problem."

85.     In addition, FEs stated that Constant Contact offered steeply discounted promotions to its existing customers to drive revenue increases during the late 2014 and early 2015 timeframe. FE 4 stated, "they were giving away a $150.00 product package deal for $50.00."

86.     Similarly, FE 6 stated that in late 2014, support staff began selling an email offering to existing customers for approximately $50.00 and FE 3 noted Constant Contact began offering "a lot of promotions where they heavily, heavily just discounted the product."

## I.     Toolkit's Ultimate Demise

87.     Despite the glowing statements made during the Class Period, Defendants knew that the Company's customers were experiencing extreme dissatisfaction with Toolkit and ultimately were forced to take remedial action.

88.     For example, although Toolkit was initially offered only to new clients, it was always the Company's intent to migrate its existing customers to the Toolkit packages.  From the beginning of the Class Period, Constant Contact announced that it had "begun planning for the migration of our existing customer base to Toolkit," and that "[s]tarting in Q3 [2014], we'll test various segments and migration approaches, and learn our way into a great customer migration experience with the goal of maximizing revenue, retention, and customer value."

89.     However, as time went on, the Company began to change its tune.  In Q3 2014, the Company stated,  "we certainly would like to begin moving customers fairly aggressively through the course of 2015."  But the Company revealed, contrary to popular belief, that it was still maintaining a flow of traffic to its standalone offerings.  Its explanation for doing so was "really in order to maintain a control so we understand the impact of Toolkit, to evaluate the effects of Toolkit on different audiences, and to optimize our results."

90.     And then, on January 29, 2015, Constant Contact announced, "[b]ased on the results of numerous conversations with customers, we now plan to hold back mass migration of existing customers to Toolkit until we incorporate the new offering environment and common workflows."

91.     Not only did the Company not migrate customers, but ultimately, by the end of the Class Period, just a little over a year after Toolkit's official launch, consumer acrimony reached such a high level that Defendants decided to ***completely abandon*** the Toolkit brand, after they had spent significant resources on its promotion.

92.     On October 23, 2014, Constant Contact announced that it would be renaming the Toolkit "Basic" package to the "Email" package.  It explained, "[m]ost prospects associate the Constant Contact brand with the best Email marketing solution for small businesses. We've discovered through testing that we can improve our conversion rates by making it clear to those looking for Email marketing that Toolkit is Email marketing and more."  It continued, "[y]ou should not be surprised to see continued refinements in the coming months as we constantly look to optimize and improve on the results to date."

93.     Then, on January 29, 2015, Constant Contact announced that "after thorough testing" it had renamed all of the packages within Toolkit.  Apparently trying to iterate on the "Email" theme, the Company renamed the three packages to Email, Email Plus, and Personal Marketer.  The

Company attributed the name change to wanting "to better reflect our offerings, and our customer experience."

94.     Finally, on July 23, 2015, during the Company's earnings conference call, the Company disclosed that it was implementing a new platform referred to internally as "Galileo," stating, in pertinent part, as follows:

> The team is also auditing the entire website experience and the totality of our positioning to help drive a simplified and aligned set of messaging and flows.

*     *     *

> We're increasingly excited about our next-generation authoring platform, internally code-named Galileo.  More than 50,000 customers and trialers are using it, and the feedback to-date has been impressive.  In the coming quarters, all new trialers will be using Galileo, and we'll begin the migration of existing customers to the new platform.

> Galileo is not just a new product feature, it represents a fundamental change in how customers use our product, and makes it dramatically easier for our customers and trialers to create beautiful marketing campaigns.  We believe this greatly enhanced experience will leap-frog our competitors.

95.     During the same call, despite almost an entire year of highlighting the successes and accomplishments of the Toolkit product, Constant Contact announced that it was ***completely abandoning*** the Toolkit brand, stating, in pertinent part, as follows:

> [T]he naming convention toolkit has been largely removed from our marketing materials and is being replaced simply with Constant Contact.

> While the strategy of an integrated marketing platform will remain front and center, you should not expect to see the toolkit name going forward.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.     Second Quarter 2014 Financial Results

96.     The Class Period begins on July 25, 2014.  After the close of trading on July 24, 2014, Constant Contact issued a press release announcing its second quarter 2014 financial results, for the period ended June 30, 2014.  The press release announced that the Company was "**raising**

our revenue guidance for the year and [we] are on target to deliver accelerated revenue

growth, expanded profitability and increased free cash flow for 2014."[2]  The Company further

stated, "Our confidence in our ability to achieve our long-term growth objectives is reflected in the

$30 million share repurchase program we announced today."  With respect to the Company's ARPU

and retention rate, the release stated, in pertinent part, as follows:

### Second Quarter 2014 Operating Metrics

*       *       *

- **Average monthly revenue per unique customer (ARPU) in the second quarter was $44.40, up from $43.82 in the first quarter of 2014 and up from $41.06 in the second quarter of 2013.**

- **Monthly retention rate of unique paying customers remained in its historical range of 97.8%, plus or minus 0.5%, for each month during the second quarter.**

97.     Later that day, Constant Contact held a conference call with analysts and investors to

discuss the Company's earnings release and business.  During the conference call, Defendant

Goodman spoke positively about Toolkit stating in pertinent part, as follows:

[T]he most significant near-term initiative is the introduction of Toolkit, which we began offering to all new customers in April.  **We are pleased with the customer response, and continue to test and iterate our way into optimizing Toolkit. Providing value to our customers, and ensuring their success is our chief priority**.

98.     During the conference call, Defendant Grewal discussed the Company's issues with

retention rate and blamed the increased customer attrition to credit card failures.  Specifically,

Defendant Grewal stated, in pertinent part, as follows:

**While customer additions and ARPU growth were consistent with expectations, we did experience higher-than-expected attrition rates in the quarter. In large part, this resulted from an increase in the credit card failure rate, or, to put it more simply, not being able to successfully charge a credit card on file after**

---

[2]     Emphasis is added unless noted otherwise.

**multiple attempts**. While we identified this trend in Q2, the increase in credit card failure rates began in Q1.

**After speaking to our credit card processor, we believe this to be an industry-wide trend likely related to credit card breaches at large retailers late last year.** These well-publicized events resulted in an abnormally high issuance of replacement credit cards, which appears to be increasing the rate of credit card failure. **We are seeing some improvement, but remain cautious until we see trends return to historic levels.**

**From a customer lifetime value perspective, we continue to expect substantive gains for the full year**. Customer lifetime value should increase by about $100 or 10%, to about $1,050. **The increase will be driven by** improved gross margins, and an about 10% **growth in ARPU** to the $46 to $47 range. **These gains will be partially offset by somewhat higher cost of customer acquisition, as well as the impact of the credit card failure rate on attrition.**

99.     Analysts reacted positively to the Company's earnings announcement and maintained

their ratings of "Buy" and "Outperform" on Constant Contact Stock.  For example:

- In our opinion, Constant Contact has the best combination of accelerating growth, improving margins and compelling valuation (even using old-fashioned EV/cash flow) of any mid-cap stock we follow.  We expect the stock to climb a "Wall of Skepticism" over the coming months as the firm gradually inches expectations higher.  We would be buyers of this stock today.  Canaccord Genuity, *A VERY GOOD START TO WHAT SHOULD BE A LONG RUN. INCREASING TARGET TO $40, REITERATE BUY*, July 24, 2014.

- In our opinion, the company has successfully evolved from a single product (email marketing) to a multi-product provider of online marketing tools for micro-sized businesses.  The company's new packaging is a home run as the average invoice for new clients is 25-30% ($10) higher.  Given customer churn of 25%, due to the nature of micro businesses, much of its 615,000 existing client base will naturally move to the new packaging without the need to cross-sell, but this also means that net customer additions will remain around 10,000 per quarter, in our opinion, until it begins focusing on international growth.  We think there continues to be meaningful upside potential to Street consensus driven by ARPU.  Barrington Research, *Firing on All Cylinders To Reaccelerate Growth*, July 25, 2014.

- [W]e suspect [Constant Contact's] guidance approach is under-promise and over deliver.  *Id*.

**July 30, 2014 Quarterly Report**

- 28 -

100.    On July 30, 2014, Constant Contact filed its Form 10-Q ("Q2 2014 Form 10-Q") with the SEC, which was signed by Defendants Goodman and Grewal, and confirmed the Company's previously announced quarterly financial results and financial position.  In addition, the Q2 2014 Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Goodman and Grewal, stating that:

I, Gail F. Goodman, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Constant Contact, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

101.    The Management Discussion & Analysis ("MD&A") included in the Q2 2014 Form 10-Q contained materially false and misleading statements about Toolkit, the Company's ARPU, and retention rates, stating, in pertinent part, "**[w]e believe Toolkit will allow us to achieve increased product usage, increased revenue per customer and higher retention rates.**"

102.    In addition, the risk factor disclosure included in the Q2 2014 Form 10-Q deceptively referred to ***potential risks*** associated with Toolkit, when, in fact, such risks were ***then existing***, such as:

- To the extent that offering this integrated platform leads to a decline in the number of customers or a decline in revenue, or negatively impacts our existing customers, our business and results of operations **may** be affected adversely.

                            *        *        *

- Our efforts to offer product bundles **may** not result in significant revenue growth, **may** negatively impact trialer conversion rates, **may** be confusing to our customers and **may** disrupt existing product offerings, which still account for a significant majority of our revenue, any of which **may** harm our financial performance and impede our long-term growth strategy.

- 30 -

- [I]f we offer a bundle of our products, such as Toolkit, that **our customers and prospective customers do not find compelling**, our business will also be harmed.

## August 12, 2014 Oppenheimer Technology, Internet & Communications Conference

103.   On August 12, 2014, Constant Contact participated in the Oppenheimer Technology, Internet & Communications Conference.   Analyst Brian Schwartz of Oppenheimer & Co. ("Oppenheimer") asked specifically with regard to the biggest driver for "growth as well as customer lifetime value between ARPU, retention, customer adds, and such."   Defendant Grewal explained, in pertinent part, as follows:

> We've indicated **we expect ARPU to grow about 10%.   Retention may have some small gains**, but the remaining 6% is based on customer adds, customer base growing larger.   **So I'd say ARPU is a big part of the 2014 story**.
>
> **I'd say in 2015 ARPU will still be a predominant piece of that play**. And just because **with Toolkit rolling out to our existing customer base, that is the next incremental lift that you see**.   But I think that there are opportunities for us to accelerate the customer piece of it. So as we kind of get closer to that 20% – or without giving any specific guidance on 2015, **I think expectation is strong ARPU growth combined with some opportunities on the customer  add play as well to create that incremental lift.**

104.   With regard to Toolkit, Oppenheimer asked about "the conversions [to paying customers] that you're seeing people coming to the website.  How are those tracking according to your plan internally?"   Defendant Grewal falsely responded, in pertinent part, as follows:

> **And in terms of Toolkit** and conversions and working with our expectations, **it's generally consistent with what we expected** to play out.  What we are finding is there are trade-offs that we have the ability to make with Toolkit.  And so we're trying to understand how to balance and what are those right trade-offs as they apply to customer adds and ARPU versus customer lifetime value.
>
> *          *          *
>
> So what is that right balance between ARPU growth and customer adds?  We need both.  And so – and how do we manage the commission plans to incent the right behavior?  So there's a level of complexity and optimization that we are working our way through at this point.  **The good part of it is we feel confident in the direction**

**we're going in and the results we are seeing, and in terms of relative to getting to the guidance we have and also setting ourselves up for 20/20 in future years.**

105.    In addition, Oppenheimer asked a follow-up question regarding the Company's prior references to "some higher-than-expected attrition as a result of the credit card incident." Defendant Grewal admitted that the retention rate had not gone back to "historical levels," and continued to falsely attribute customer cancelation to credit card failures, stating, in pertinent part, as follows:

> Yes, it hasn't gone back to our historical levels. So as I look at July, it hasn't gone back. We saw some improvement in June, but we haven't seen it continuing to those levels. So the color we've gotten – so for those who don't know about this is it started in Q1, but we actually saw – we saw it, we picked it up in Q2. So the trend started in February.

> We process – **most of our customers pay us on a monthly basis**. Some are prepaid six months, 12 months. And we charge their credit card every month. **And every month there are certain percentage of cards that we can't transact with either because the card numbers change, expiration date just changed, or they're over their credit limit. If I looked at the historical trend, it's just a flat line. It's a certain percentage, and it's consistent with industry standards as to what failed.**

> In February, you started seeing a pick-up, and **that pick-up accelerated in April and May**. And we think it cost us a couple of thousand cancellations or attrits because after some point we cancel the account or suspend it. And we estimate it cost us about $1 million of revenues in 2014.

> We talked to our credit card processor. They are seeing this trend in the industry. They think it's linked to some of the credit card breaches that you had with companies like Target, where there's a lot more replacement cards that are being sent out. **So there are a lot more numbers we don't have in our system. And we've been able to localize it to even the three institutions where we're seeing the biggest challenge**. It's Wells Fargo, it's JP Morgan Chase, and one other – a Canadian bank that's escaping me right now.

> Well, that now explains the why. We're trying to understand how quickly does it get flushed through the system. So at this point I'd say it hasn't flushed through the system, so we're still seeing in July the trends we saw in Q2.

**August 13, 2014 Canaccord Genuity Growth Conference**

106.    On August 13, 2014, Constant Contact participated in the Canaccord Genuity Growth Conference. During Constant Contact's presentation, where Defendant Grewal falsely stated that the

Company had received a "really good customer response" to Toolkit, stating, in pertinent part, as follows:

> So about 18 months ago we started working on something which we introduced in April called Toolkit.
>
>                        *        *        *
>
> And it's something that **we've gotten good, really good customer response to it since we launched it; it launched in April**. And very excited by the trends we're seeing.
>
> **The launch of Toolkit was one of the reasons that we raised our guidance pretty substantially in the April time frame**. So our guidance was, when we entered the year, for about 13% growth, which was flat to 2013. We raised our guidance to $330 million, so a little over 15.5% back in April based on the results we're seeing with Toolkit.
>
> What we saw was that new customers coming it were coming in at an average ASP of about $10 higher than what we have historically found. **And the success of Toolkit led us to raise guidance again after our June quarter on our July earnings call to $331 million, representing 16% growth**.

107.    During the Company's presentation, Defendant Grewal also reported that Toolkit would drive the Company's ARPU, stating, in pertinent part, as follows:

> And there, there are three key elements that drive ARPU. One is cross-selling additional products and services. Second is helping our customers grow their list size, because the bigger their list size grows – we have a pricing framework that the bigger your list, the more you pay us. **And the third is as we've introduced Toolkit and have these different packages that are priced differently, getting a package mix that is more favorable to increasing ARPU.**

108.    Then, when explaining the Company's three growth levers, Defendant Grewal represented that the Company had "done a good job in keeping our customers," stating, in pertinent part, as follows:

> And there are three levers we have to deliver growth. The first is acquiring new customers. So today we have about 615,000 customers. We hope to add – once you account for attrition – about 40,000 new customers, which is flat to last year.
>
>                        *        *        *

**The second is keeping our customers longer . . . . [W]e've done a good job in keeping our customers by delivering better success**.

109.    Later during the presentation, Defendant Grewal positively described the Company's

retention rate trends, stating, in pertinent part, as follows:

> **And seeing that our efforts have paid off**, whereas at the end of 2013 the average tenure had increased to about 50 months.  **A pretty significant increase of over 20% in retention rates, which plays into customer lifetime value** . . . .

**September 11, 2014 Deutsche Bank Technology Conference**

110.    On September 11, 2014, Constant Contact presented at the Deutsche Bank

Technology Conference.  During the conference, Defendant Grewal made positive statements about,

Toolkit, ARPU, and customer retention, stating, in pertinent part, as follows:

> [W]e've seen some great trends on each one of [the three growth levers]. . . .  **So in terms of ARPU**, just seeing some record growth in last year, following it up with **record growth rates in 2014 driven by Toolkit**, driven by our acquisition of SinglePlatform, which is expanding with great ASPs.
>
> **Retention is showing great improvements**. Email, a few years ago, the average tenure of our email customer was about 40 months.  Today it is about 50 months, so a little over 20% improvement.  We think we can grow that to 55 months in the coming years.  And new customer adds, we've been adding about 40,000 net new customer adds a year for the last couple of years.  And we do see opportunities to increase that over the course of the next few years.
>
> One of the key metrics that we look at and I look at is customer lifetime value, which is obviously comprised of, what does it cost for us to acquire a customer?  Which is about $600. How long do they stay with us?  Which is about 50 months.  What is our cost of servicing them? And finally, what are they paying us?  And in looking at those trends, what we've seen with customer lifetime value is that customer lifetime value last year grew to about $950 up from about $800.  **So, a really significant increase driven by improvements in ARPU and retention.**

111.    Following Defendant Grewal's prepared remarks, investors asked specific questions

regarding the Toolkit launch, including questions specific to the typical Toolkit customer and its

customer renewal rates, or "churn."  In response, Defendant Grewal stated, in pertinent part, as

follows:

**Right now it is generally consistent**.  It moves around a little bit.  But over time, we know a couple of things about retention rates.  Which is if we can get customers engaged in using more of the campaign types – in the past, we used to say customers that use two products, their retention rate is 20% better.  Those that use three or more of our products, their retention rate is 40% better than those who just use one.

We've seen that play out.  So what we are looking to do here is get people engaged in more campaign types.  So it's not just about doing an email campaign. . . .  **And we think that over time what will happen, is as people start using Toolkit and using multiple campaign types, that retention rates should improve. And we are seeing better engagement off of – that is offset in terms of multiple campaigns that we saw prior to Toolkit**.

112.     The statements referenced above in ¶¶ 96-111 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them: (a) that Toolkit was riddled with known but undisclosed technical defects; (b) that customers widely rejected the higher-priced Toolkit offerings; (c) that as a result of Toolkit's technical defects and high price, Constant Contact was experiencing an unusually high volume of customer cancellations that would cause the Company to create a special customer retention team in an effort to reverse this negative trend; (e) that the Company knowingly understated customer attrition rates and overstated customer retention rates by delaying customer cancellations, offering customers reduced pricing and/or credits, and/or "suspending" customer subscriptions so that the accounts would appear active when in fact these customers had indicated that they wanted to cancel their subscriptions; (f) that as a result of the Company's customer retention practices, the Company materially distorted its customer related metrics, including its ARPU and customer retention rate, as these metrics did not accurately portray the true number of customers or the revenues generated by those "customers"; (g) that the Company was not experiencing increased customer attrition due to issues with credit cards but rather customers were cancelling due to issues with Toolkit; and (h) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its products,

revenues, earnings and business trends and therefore these statements were materially false and misleading when made.

**B.      Third Quarter 2014 Financial Results**

113.    On October 23, 2014, Constant Contact issued a press release announcing its financial results for the 2014 third quarter, the period ended September 30, 2014.   The press release represented that the Company "delivered another strong quarter, punctuated by accelerating revenue growth, expanding profitability and an increase in customer additions."

114.    Defendant Grewal commented on the result, stating, in pertinent part, as follows:

> Third quarter results continued our two-year track record of delivering consistently good results.  Accelerating revenue growth and expanding margins have been the hallmark of this year, and in the quarter, revenue growth, margins and free cash flow all showed meaningful gains.  **Our preliminary expectations for 2015 show an acceleration of revenue growth for the second consecutive year** while meaningfully expanding margins.

115.    With respect to the Company's ARPU and retention rate, the release stated, in pertinent part, as follows:

> **Third Quarter 2014 Operating Metrics**
>
> *      *      *
>
> - Average monthly revenue per unique customer (ARPU) in the third quarter was $44.89, up from $44.40 in the second quarter of 2014 and up from $41.40 in the third quarter of 2013.
>
> - Monthly retention rate of unique paying customers remained in its historical range of 97.8%, plus or minus 0.5%, for each month during the third quarter.

116.    Later that day, Constant Contact held a conference call with analysts and investors to discuss the Company's earnings release and business.   During the conference call, Defendant Goodman spoke positively about Toolkit, stating, in pertinent part, as follows:

> Let me begin with an update on **Toolkit, which continues to perform well**.  **We're seeing better customer engagement, higher ARPU, improving retention rates, and increased lifetime customer revenue from Toolkit customers**.  As we

mentioned on the last call, we're iterating rapidly to refine the positioning, selling, onboarding, and product experience to maximize customer success and lifetime customer value.  Like any significant product introduction, it will take time to fully settle into the repeatable model of the new product cycle.  **At this point, there are tremendous learnings, constant testing, iterating, and refinements.**

117.    During the conference call, Defendant Goodman noted that the Company was renaming the basic Toolkit package to "Email" to better improve the conversion website visitors to paying customers stating, in pertinent part, as follows:

> You'll soon see that **the basic package will be renamed the Email package**.  Most prospects associate the Constant Contact brand with the best Email marketing solution for small businesses.  **We've discovered through testing that we can improve our conversion rates by making it clear to those looking for Email marketing that Toolkit is Email marketing and more.**  You should not be surprised to see continued refinements in the coming months as we constantly look to optimize and improve on the results to date.

118.    Defendant Grewal spoke about customer cancellations, customer attrition, Toolkit, and revenue guidance, stating, in pertinent part, as follows:

> Let me take a moment to note a few of the key financial and operating highlights in the quarter.  First, revenue, as Gail mentioned, came in at the midpoint of our guidance range at $83.5 million, reflecting 16% year-on-year growth**.  We continue to experience higher-than-expected credit card failure rates which negatively impacted Q3 revenue by $150,000 to $200,000.  We have been working with our credit card processor and will look to take advantage of more advanced tools in the coming months, which we believe may mitigate the recent impact.**
>
> *        *        *
>
> **ARPU acceleration will be driven by the gains delivered by Toolkit** and one of our seasonally stronger quarters, pricing refinement and tests to better accommodate migration of existing customers to Toolkit, and continued momentum in single platform where ARPU continues to grow by multiple dollars each month.
>
> **Attrition continued to be buffeted** on the margin **by higher than historical levels of credit card failure rates**.  **We did see a bit of improvement in Q3 versus Q2 leading to sequentially better retention rates**.  However, the impact is expected to be a bit north of $1 million in lost revenue in 2015.  We continue to refine our internal processes, implementing call-out plans to those customers, and look to work with our processor to take advantage of new tools that should help mitigate the impact.

Customer lifetime valued showed really strong gains in the quarter driven by improving ARPU and cost of customer acquisitions that fell dramatically by about $100 to about $570.  We expect customer lifetime value to increase to about $1050 as we exit the year, or 10% increase compared to last year.

119.     During the conference call, analysts questioned Defendants about the assumptions and modeling the Company was employing, and how much of the Company's expected growth was attributable to Toolkit.  In response, Defendant Grewal falsely and misleadingly stated, in pertinent part, as follows:

We were showing an acceleration of customer ads on the gross ad level in 2014, and we expect to be able to show an acceleration of customer ads also in 2015.  **And notwithstanding [sic] the credit card failure issue** which we think we'll get our handle on over time, **we are seeing underlying improvements in retention, so we just see the basis of kind of lifting all three levers and getting to that accelerated revenue growth**.

*          *          *

Given our growth levers of ARPU, customer ads, and retention, **I think we're going to be able to show that we can nicely grow on each one of those levers**.

120.     Finally, in response to an analyst inquiry concerning Toolkit customers and migrating existing customers to Toolkit, Defendant Goodman represented that the Company was seeing "great conversion" to Toolkit, stating, in pertinent part, as follows:

The first is folks who are coming to us and requesting to be migrated.  Say the lion's share that is coming through our solution provider channel where they have seen the power of Toolkit for their other clients and are recommending to their existing clients that they upgrade to Toolkit.  That just is feeling really good, really comfortable. **We're seeing great conversion into our essential package for that group, so that's working really well.**

We've also been testing in a lighter weight way bringing offers to existing customers who have not heard about Toolkit and understanding their reaction, what would they want to know, see, test, and touch before they choose to upgrade.  We've done that through both focus group work and outbound RITEs with promotions followed by phone calls, **and we're definitely learning that interest is high but there's also a real desire to understand and see and maybe even touch before they make the decision to move.  So, we are definitely in the process of understanding what's the best way to give them that education before they're faced with migration**.

- 38 -

121.    Analysts reacted positively to the Company's statements, causing them to maintain their ratings of "Buy" and "Outperform" on Constant Contact stock.  For example:

- Constant Contact is playing out pretty much exactly as we expected. New products (Toolkit and Single Platform) and improving pipeline conversion should continue to allow the firm to see accelerating growth, and something rare these days, good profitability that is getting even better.  Canaccord Genuity, JUST WHAT THE DOCTOR ORDERED; SOLID QUARTER AND MORE IMPRESSIVE GUIDE, October 23, 2014.

- The fact is the firm is executing far better than it has in the past. Estimates have risen in each of the past four quarters.  Indeed, our forecast for 2015 revenue growth 18 months ago was 12% – it's now 17%. *Id.*

- Constant Contact reported its 8th straight quarter of meeting/beating Street expectations. 3Q results and the above-consensus guidance for 2015 show that the Toolkit cycle is working well as it draws in new subscribers at higher ARPU and weakens the bears' thesis that promotional activity is pulling demand forward and hurting pricing. Bottom Line: CTCT shares are poised to become a good growth and cash flow story over the NTM with broadening valuation assessments to attract a new class of investors.  Constant Contact is set up to finish the year not only projecting accelerating business and ARPU trends, but in a strong position to monetize on its large base in 2015 as it harvests fruits from a re-energized product portfolio.  Oppenheimer, *3Q Results and Strong 2015 Guidance Indicate the Toolkit Catalyst Is Working*, Oct. 23, 2014.

**October 29, 2014 Quarterly Report**

122.    On October 29, 2014, Constant Contact filed its Form 10-Q for the quarter ended September 30, 2014 ("Q3 2014 Form 10-Q") with the SEC, which was signed by Defendants Goodman and Grewal.  The Q3 2014 Form 10-Q contained materially false and misleading MD&A, risk factor disclosures, and internal control disclosures, as well as Individual Defendants' certifications thereon.

123.    The Q3 2014 10-Q, also, for the first time, represented that the Company was being negatively impacted by credit card issues.  The Q3 2014 10-Q stated, in pertinent part, as follows:

Over the last several months, we have experienced higher than normal credit card failure rates as we seek to charge our customer accounts.  We believe that this is occurring because credit card issuers have issued a significant number of new credit

cards as a result of the highly-publicized data breaches that have impacted national retailers and financial institutions.  While we are taking various actions to address this issue, this trend has negatively impacted our business and may continue to do so in the future.

## December 2, 2014 Credit Suisse Technology Conference

124.    On December 2, 2014, Constant Contact presented at the Credit Suisse Technology Conference.  During the presentation, the Credit Suisse analyst questioned Defendant Goodman about, among other things, customer retention, customer adoption, and conversion.  The following exchanges took place:

Michael Nemeroff - Credit Suisse – Analyst:

Let's **talk about retention rate; that's really critical to growth** of the Company going forward, where are we seeing that trend?  It's actually – it stepped up a little bit over the last couple of quarters, why is that happening, what do you – and how do you think that's going to trend over and why is that important on a go-forward basis for you?

Defendant Goodman:

So, we have three levers of growth in the business.  New customers, ARPU, and retention; and we focus a lot on all three.  **In retention, we've really been very effectively using big data and analytics** to understand pockets of opportunity **to drive retention**.  It all starts with engagements and success.  So when a customer is highly engaged in using the product and getting great results, guess what?  Great retention.  They're going nowhere.  They're getting a super high ROI, you'll not turning off email marketing.  So the question really is what happens to take someone off that track?  We've really two different patterns, early engagement, do we get them on board successfully; and then ongoing engagement.  So we're starting to really be able to see patterns and notice **when a customer is kind of off track, intervene, and then drive them into higher engagement and higher success**.

125.    With regard to conversions, the same Credit Suisse analyst asked:

Conversions are extremely important and those – that's – the top of the funnel is important but getting them through the funnel and convert it equally is important, if not more. How the conversion has been going from Toolkit trials versus just a standard email and some of the different bundles that you put together, have you noticed any trends there?

126.   In response, Defendant Goodman admitted that Toolkit was below par, but failed to fully disclose the true nature and extent of Toolkit's problems, and instead falsely reassured investors that Toolkit was improving and "not far off" the bar set by email marketing:

> Yes.   So, let's start with email marketing.   We had 15 years of conversion optimization.   So that's probably the bar to get over.   So **Toolkit started below the stand-alone email marketing bar and we've been pushing it up towards that bar, not far off from it, but we definitely are still a little bit below, but looking to get to parity and beyond.**

127.   Defendant Goodman also highlighted the purported ARPU growth delivered by Toolkit, stating that new Toolkit customers were "coming in about $10 higher ARPU."   She added that Toolkit would be a "**powerful lever[] for ARPU growth going into 2015**" based on new Toolkit customers as well as existing customers migrated to Toolkit stating, in pertinent part, as follows:

> First, it's **Toolkit customers coming in, new customers coming in at a higher ARPU**.   Second, as we get deeper into the year, **we'll begin migrating customers from stand-alone email to Toolkit; that will give us another ARPU lift opportunity**.   And then third, we're rapidly scaling single-platform, which as you said earlier, comes i[n] at more of a $79 ARPU, then a $45 ARPU.   So, next year should be another very nice ARPU growth year.

**December 9, 2014 Barclays Global Tech Conference**

128.   On December 9, 2014, Constant Contact presented at the Barclays Global Tech Conference. During the conference, Defendant Sisitsky falsely commented that the Company was "[r]eally starting to see some nice early success" with the launch of Toolkit.   Concerning customer retention, Defendant Sisitsky made the following materially false and misleading statements, in pertinent part, as follows:

> I think we've also **shown a meaningful improvement from customer retention rates**.   And really Q3, when we announced our Q3 financial results, it was really the first time that we were able to show year-on-year growth in gross customer additions.

*      *      *

Yes, **we've have definitely seen [the Company's data analytics] impact positively our customer retention rates**.  And I think it's one of the reasons why we have moved from an average customer staying with us for about 45 or so months to an average customer staying with us for about 50 or so months.

**So really a meaningful improvement in customer retention rates**.  And I would say longer term, we expect to maybe get another 10% improvement in customer retention rates as well.  So I think there's still more opportunity to improve there.

### January 13, 2015 Needham Growth Conference

129.    On January 13, 2015, Constant Contact presented at the Needham Growth Conference.  During the presentation, Defendant Grewal represented that Constant Contact possesses computer analytics that assign retention scores to "every customer" on "a daily basis."

130.    Defendant Grewal represented that Constant Contact experienced a "little bit" of headwind during 2014 that was associated with "a slightly higher" credit card failure rate, stating, in pertinent part, as follows:

The one thing I'll say about retention in 2014 is **we have felt a little bit of a headwind**, which is worth mentioning.  **We've seen just a slightly higher credit card failure rate** and what that refers to is our customers mostly pay us on a monthly basis and we've seen, with the breaches at Home Depot and Target and others, the Best Buy, etc., is that with the amount of replacement credit cards that are out there in the system we just don't have the right credit cards on file and so we're seeing a slight increase and sometimes we just can't get in touch with a customer because maybe they are episodic users, not – it doesn't take away from the notion that we're accelerating growth and top-line growth in 2014.  Last year in 2013, we did 13% growth.  We guided at the end of Q3 to 16% growth and **so while it's a headwind, it sits on the margin, some noise but it's worth mentioning**.

131.    The statements referenced above in ¶¶ 113-130 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them: (a) that Toolkit was riddled with known but undisclosed technical defects; (b) that customers widely rejected the higher-priced Toolkit offerings; (c) that as a result of Toolkit's technical defects and high price, Constant Contact was experiencing an unusually high volume of customer cancellations which caused the Company to

create a special customer retention team in an effort to reverse this negative trend; (e) that the Company knowingly understated customer attrition rates and overstated customer retention rates by delaying customer cancellations, offering customers reduced pricing and/or credits, and/or "suspending" customer subscriptions so that the accounts would appear active when in fact these customers had indicated that they wanted to cancel their subscriptions; (f) that as a result of the Company's customer retention practices, the Company materially distorted its customer related metrics, including its ARPU and customer retention rate, as these metrics did not accurately portray the true number of customers or the revenues generated by those "customers"; (g) that the Company was not experiencing increased customer attrition due to issues with credit cards but rather customers were cancelling due to issues with Toolkit; and (h) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its products, revenues, earnings and business trends and therefore these statements were materially false and misleading when made.

### C.      Fourth Quarter 2014 Financial Results

132.    On January 29, 2015, Constant Contact issued a press release announcing its financial results for the 2014 fourth quarter and year-end , the periods ended December 31, 2014.  The press release represented, among other things, "**[o]ur business continues to show strength and we are making great strides in our evolution into an integrated marketing suite (the Constant Contact Toolkit™)**.  We made considerable progress on several multi-year growth initiatives this past year, putting us on the path to achieve sustained revenue growth greater than 20% and expanding profitability margins greater than 20%."

133.    With respect to certain of the Company's operating metrics, the release stated in pertinent part, as follows:

**Operating Metrics**

\*       \*       \*

- Average monthly revenue per unique customer (ARPU) in the fourth quarter was $46.59, up from $42.33 in the comparable period in 2013, and $44.89 in the third quarter of 2014, which represented the highest year-over-year growth in ARPU in the company's history.

- Monthly retention rate of unique paying customers remained in its historical range of 97.8%, plus or minus 0.5%, for each month during the fourth quarter.

134.    Later that day, Constant Contact held a conference call with analysts and investors to discuss the earnings release and the Company's year-end operating results. Although the Company was experiencing lower-than-expected customer adoption of Toolkit, during the conference call, Defendant Goodman stated, in pertinent part, as follows:

> The launch of Toolkit in April, represents a game changer for small businesses and non-profits. We believe Toolkit defines the future of small business marketing.
>
> \*       \*       \*
>
> **Toolkit continues to perform well. Customer engagement is increasing, ARPU continues to show strength, and retention rates are showing marked improvement**. All of which is helping drive higher customer lifetime value.

135.    Defendant Goodman represented the Company had renamed each of the packages within Toolkit, "**to better reflect our offerings, and our customer experience**," and stated that the planned migration of existing customers to Toolkit would now be delayed:

> **Based on the results of numerous conversations with customers, we now plan to hold back mass migration of existing customers to Toolkit** until we incorporate the new offering environment and common workflows. This will create the best experience for our customers. We now expect migration of existing customers to be a late 2015 and 2016 initiative, providing opportunities for ARPU gains in the second half of 2015 and into 2016.

136.    In response to analyst's follow-up question about the delayed migration of existing customers to Toolkit, Defendant Goodman stated, in pertinent part, as follows:

- 44 -

When you ask a customer to move, why not move them to your very best plan?  And so it really is much more about the quality of the solution we think we're going to have in the back half of 2015.  **Toolkit is great now, but Toolkit is going to be, to use a Boston phrase, wicked awesome at the end of 2015**.

137.    In addition, Defendant Goodman represented that the "vast majority" of new customers during 2015 would subscribe to Toolkit, stating, in pertinent part, as follows:

I haven't actually done that math at this point.  **I would expect the vast majority of new customers in 2015 to come in on Toolkit.**  So I think you can, with the exception of course of the SinglePlatform customers, you can look at the majority of gross ads coming in on Toolkit, and probably the majority of attrition, being a little bit more pre-Toolkit.

And then the migration is a big swing vote.  And we are really to learn away into that in the back half of 2015.  **I'd be surprised if by the end of 2016, we weren't pretty close to everybody on Toolkit**.  But again, we'll have to see how that plays through as we begin migration.

138.    In response to an analyst's question about the Company's confidence in maintaining its 2015 guidance "even despite delaying the [existing customer] migration [to] Toolkit," Defendant Grewal stated, in pertinent part, as follows:

I think what **we are seeing** is **just an underlying strength in our business** that's continued to grow over the course of 2014.  We are showing, if you look at the growth leverage, gross adds improving year on year, second consecutive quarter.

**We are seeing the basis of net ads [customer additions] being able to improve**, **which we think will happen in 2015**.  So that gives us confidence. ARPU growth, when you look at the underlying drivers, [ARPU] growth, we expect many of them to continue and actually accelerate in the back half of the year.

139.    Then, in direct contradiction of his statements just days earlier at the January 13, 2015 Needham Growth Conference, Defendant Grewal, announced that 2014 customer retention rates had *declined* on a year-over-year basis, stating, in pertinent part, as follows:

**Retention rates, meanwhile, showed a slight decrease versus last year**, primarily **due to the increase in credit card failure rates**.

140.    Thereafter, Defendant Grewal represented that Constant Contact was "starting to see the basis of an acceleration in net customer growth" and that the Company was "aggressively

working to improve on these retention trends."  In addition, Defendant Grewal represented that Constant Contact was experiencing increasing customer additions.  Defendant Grewal, stating, in pertinent part, as follows:

> However, **we are starting to see the basis of an acceleration in net customer growth**, and hope to prove that out over the course of 2015.
>
> *      *      *
>
> ARPU showed real strength in the year, increasing by over 8% to $44.94.  The $3.58 increase represents the highest annual ARPU increase in the Company's history, more than double the ARPU increase in any other year.
>
> *      *      *
>
> Looking ahead to 2015 **we expect another year of accelerating revenue growth and a meaningful expansion in profitability**.  We expect to drive top line revenue growth through a combination of our three growth levers: new customer additions, increased ARPU, and improved customer retention.  Importantly, we believe we are putting in place the foundation for growing net customer additions, and hope to deliver on these trends over the course of 2015.
>
> *      *      *
>
> Retention rates for the year were within the historical band of 97.8%, plus or minus 50 basis points.  However, in absolute terms, attrition rates inched up a bit in 2014.  Primarily as the result of the impact, as I've talked about in the past, of the credit card failure rate.  **We are aggressively working to improve on these retention trends**.
>
> Customer lifetime value improved to about $1,000 in 2014.  The increase was driven by record ARPU and improved gross margins.  Some these gains, however, were offset by the slightly higher attrition rates.  Looking ahead, we expect continued gains in customer lifetime value as we drive ARPU growth, improvements in retention rates, combined with a reasonably stable cost of customer acquisition.

141.   During the conference call, Defendants were also asked about how the Company was going to improve customer retention given its experience with credit card failures.  Defendant Grewal represented that Constant Contact was "aggressively tackling" customer retention issues: customer retention trends were due to credit card related failures; that underlying foundation on

customer retention was "quite strong"; and that Defendant Grewal had "a high degree of confidence

on the underlying gains in retention that we'll make."  The following exchanges took place:

Michael Huang - Needham & Company – Analyst:

Just a couple of questions for you. First of all, I guess it's impressive that you can hit your original guidance, even despite delaying the migration of Toolkit. I was wondering, is there any part of your business that has outpaced expectations, which helps you feel comfortable maintaining the guide, even despite delaying the migration?

Defendant Grewal:

**And while we've been buffeted by retention trends related to credit card failure, we are aggressively tackling those**. And beyond just credit card failure, **think we're going to be able to move the needle on retention.  So I think there's an underlying foundation that is quite strong**.

*       *       *

Brian Schwartz - Oppenheimer & Company – Analyst:

And then last question that I had for you was just in regards to the credit card failures and what's going on with retention.  I'm just trying to reconcile – I'm hoping maybe you talk about where you are on the curve in terms of getting a handle of this issue. Because I'm just trying to reconcile here; you've been very transparent each quarter with us talking about this issue.

But **your guidance in 2015, one of the drivers to the guidance is improvement in retention**.  I'm wondering if you could just talk a little bit on where you are, in terms of the curve, of getting a handle on **what's going on with the credit card failures** to give us comfort in that improvement in the second half of the year.  Thanks a lot.

Defendant Grewal:

Absolutely.  This is Harp. I think on the retention side, there are two elements.  And I don't want to make this seem like the only area that we're attacking to improve retention is credit card failure.  So I'll talk to that.

But I think it's also important to realize that under the leadership of Dave McCann at Constant Contact, who came on in 2014, **we're really putting significant efforts** in terms of driving those elements **that we think will create underlying improvements in retention**.  So we're pushing on those and that, and we've seen results there.  And that gives us confidence in terms of improving retention.

But then **coming to credit card failure**, I think we just have a better handle on what's going on. **I think there a couple of things we're doing**.  We think this an

- 47 -

ongoing competency that Constant Contact needs to have.  And as we talk to many of our peer companies, the competency that they're building as well.  So **we've dedicated a person whose sole responsibility is to focus on credit card failure** and improving those rates. What are **the best practices**, what are the tools, what's happening in the industry?

And through those efforts in the last three/four months, I've been able to identify two/three key areas **that we're going to be pushing into**.  Some of them as early as February, **taking advantage of new tools that are available to us from our credit card processor**.  **Taking advantage of predictive analytics** to understand who is most likely to be able to transact with us if we can get in touch with them.

And **so we've started those processes**.  I think we'll be updating you in the coming quarters.  But there is a **high degree of confidence on the underlying gains in retention that we'll make, and that we'll be available to reverse these trends partially on the credit card failure side**.

142.    Analysts reacted positively to the Company's statements, causing them to maintain

their ratings of "Buy" and "Outperform" on Constant Contact stock  For example:

- CTCT's excellent finish to C2014 was consistent with our bullish preview note – the firm's results were better than estimates on just about every line. Canaccord Genuity, *Solid quarter; sets up well for a strong 2015*, Jan. 29, 2015.

- In our view, the company's product is essential for small and medium sized businesses who wish to compete for customer attention and dollars in the modern economy. National Securities Research, *Never To [sic] Busy To Open An Email – Initating [sic] With A BUY Rating And $50 Price Target*, Jan. 30, 2015.

- We believe that Constant Contact's active customer growth coupled with consistently increasing average revenue per customer (ARPU) should accelerate its revenue growth rate.  *Id*.

- With ARPU up roughly 10% yr/yr driven by its new "Toolkit" product bundling initiative, we now believe the acceleration should prove sustainable and further extensible throughout 2015 as the bundle dominates new customer adds and in 2016 as its existing installed base is exploited for upgrades.  Roth Capital Partners, *CTCT: Momentum Continuing to Build Heading Into 2015*, Jan. 30, 2015.

- They have done an excellent job reinventing their business and adding more distribution and new customers.  Their ability to bundle offerings into the "Toolkit" product and bring on new growth initiatives like SinglePlatform, as well as actionable analytics, will serve them well over the next couple of

years. Rosenblatt Securities Inc., *Initiating Buy Rating – Excellent Quarter – Great Fundamentals*, Feb. 2, 2015.

- We were very impressed that they were able to exceed the metrics they laid out for 2014 without marketing their "Toolkit" offering to their installed base. *Id.*

- We are happy with their conservative guide because we think it is important for them to just continue doing what they say they will do and execute well against their goals. If they do that they will be rewarded with a higher stock price over time. *Id.*

**February 25, 2015 Annual Report**

143. On February 25, 2015, Constant Contact filed its Form 10-K for the year ended December 31, 2015 ("2014 Form 10-K") with the SEC, which was signed by Defendants Goodman and Grewal. The 2014 Form 10-K contained false and misleading MD&A, risk factor disclosures, and internal control disclosures, as well as Individual Defendants' certifications thereon.

**March 4, 2015 Morgan Stanley Technology, Media & Telecom Conference**

144. On March 4, 2015, just three weeks prior to the end of the Company's 2015 first quarter, Constant Contact presented at the Morgan Stanley Technology, Media & Telecom Conference in which Defendant Grewal represented that Constant Contact was "seeing some nice gains" in controlling customer churn, stating, in pertinent part, as follows:

Stan Zlotsky - Morgan Stanley – Analyst:

So the very nature of your business, it is a high velocity business, lots of gross customers which versus net customers. So controlling churn is obviously an important factor. How do you think about controlling churn versus as you get bigger, it becomes more important to control churn because as you get bigger the hole from churn becomes bigger and bigger. What are you looking to do there?

Defendant Grewal:

What you are laying out is absolutely correct. **We are just getting more intelligent about how to control churn**. I would say there are three things that maybe are worth highlighting. **First of all** just bringing focus to it, it sounds really silly. Until two or three years ago, **we didn't have anyone who was in charge of retention** and

so it is hard to really drive improvements in something unless you have someone who is responsible for that.

\*       \*       \*

The other thing that is worth mentioning is we are really using the power of analytics to help us and predictive analytics particularly.  Some of the things that we are doing currently **on the predictive analytics side is every customer has a retention score that is updated on a regular basis and their retention score predicts your propensity to cancel** Constant Contact in 15 days, 30 days and 60 days.  And so then the customer success team that is run by this individual Dave McCann, who we hired from Google who was running some of their retention efforts at Google, they are devising programs.

### March 4, 2015 Raymond James Institutional Investors Conference

145.   That same day, March 4, 2015, the Company presented at the Raymond James Institutional Investors Conference.  There, analysts were interested in the importance of Toolkit as compared to the Company's other growth initiatives as well as the reasoning and timing associated with migrating existing customers to Toolkit.  With respect to the Company's decision to delay the migration of existing customers to Toolkit, Defendant Sisitsky commented that the Company "got great feedback from customers" on Toolkit.  The following exchange took place:

Terry Tillman - Raymond James & Associates, Inc. – Analyst:

I know you've explained it to a certain extent.  **But was it something with just the product wasn't ready yet and there's risk, then, to try to push them to the new product**?  Or newer features were just down the pike and you felt that it would be better to wait until some of these other advanced features are available to make it more compelling to switch?  What were some of the reasons for that delay?

Defendant Sisitsky:

Yes, **it was more the latter**.  So we were really excited about some of the common authoring environments that we've got coming out a little bit later this year that are already in beta, already in the hands of customers and being tested.  **So we got great feedback from customers** on these new common authoring environments.  And think of these as being able to easily share elements of your campaign across each of different campaign types that we offer.

\*       \*       \*

- 50 -

So as **we were surveying our customer base**, as we were doing focus groups with our customers, they said these things that you've got coming out our great. Toolkit seems exciting. This common authoring environment seems really exciting as well. Don't make multiple points of migration for us. Move us once, give us all the benefit at the same time. And that will make us happier.

**So we did it really in conversations with our customers and with the folks who are going to be using the product on a daily basis.** And so, we think that pushing it back a few months was probably the right thing to do, especially since Toolkit is going to be so important to the future of Constant Contact. And we know there's going to be many years of continuing to optimize and iterate Toolkit.

146.     The statements referenced above in ¶¶ 132-145 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts detailed herein which were known to Defendants or recklessly disregarded by them: (a) that Toolkit was riddled with known but undisclosed technical defects; (b) that customers widely rejected the higher-priced Toolkit offerings; (c) that as a result of Toolkit's technical defects and high price, Constant Contact was experiencing an unusually high volume of customer cancellations which caused the Company to create a special customer retention team in an effort to reverse this negative trend; (e) that the Company knowingly understated customer attrition rates and overstated customer retention rates by delaying customer cancellations, offering customers reduced pricing and/or credits, and/or "suspending" customer subscriptions so that the accounts would appear active when in fact these customers had indicated that they wanted to cancel their subscriptions; (f) that as a result of the Company's customer retention practices, the Company materially distorted its customer related metrics, including its ARPU and customer retention rate, as these metrics did not accurately portray the true number of customers or the revenues generated by those "customers"; (g) that the Company was not experiencing increased customer attrition due to issues with credit cards but rather customers were cancelling due to issues with Toolkit; and (h) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its products,

revenues, earnings and business trends and therefore these statements were materially false and misleading when made.

## VI.   THE TRUTH ABOUT TOOLKIT SLOWLY EMERGES

### A.   First Quarter 2015 Financial Results

147.   On April 30, 2015, Constant Contact issued a press release announcing its financial results for the first quarter of 2015, the period ended March 31, 2015.  For the quarter, the Company reported lower-than-expected revenue, which Defendants stated caused them to lower the Company's 2015 revenue guidance.  Defendant Goodman, represented, in pertinent part, as follows:

> "We were disappointed with the mixed results for the quarter, as revenue came in below expectations while profitability was better than expected," said Gail Goodman, chief executive officer of Constant Contact.  "**In the quarter we didn't deliver an acceleration in customer additions as expected**, **which resulted in missing our revenue goal.  Given the current trends, we are adjusting down our revenue plans for the remainder of the fiscal year."**

> "We are confident in our strategy for an integrated marketing suite for small businesses and organizations," continued Goodman.  "However, **it is clear that we need to execute better**.  We have a framework to deliver sustainable revenue growth of greater than 20 percent, coupled with profit margins greater than 20 percent, and while disappointed by the near term setback, we are confident in our ability to deliver on this goal over time."

148.   Despite these admissions, Defendants continued to conceal the full extent of the problems with Toolkit and represented that there is a "path to accelerating revenue growth."  The release stated, in pertinent part, as follows:

> **"The underlying trends coming out of 2014 suggested a path to accelerating revenue growth for the [2015] year**.  However, during the first quarter we experienced **unexpected** headwinds," said Harpreet Grewal, chief financial officer of Constant Contact.  "While we are adjusting down our revenue guidance for 2015, we are raising guidance for full year profit margins as well as our full year free cash flow expectations.  We are committed to getting back on the track of consistent, reliable execution, and remain committed to driving accelerating revenue growth over time, while continuing to expand margins and generate higher cash flow."

149.    The press release reported certain of the Company's operating metrics, stating, in pertinent part, as follows:

**Operating Metrics**

\*          \*          \*

- Average monthly revenue per unique customer (ARPU) in the first quarter was $47.09, up from $43.82 in the comparable period in 2014, and $46.59 in the fourth quarter of 2014.

- Monthly retention rate of unique paying customers remained in its historical range of 97.8%, plus or minus 0.5%, for each month during the first quarter.

150.    Later that day, Constant Contact held a conference call with analysts and investors to discuss Constant Contact's 2015 first quarter operating results.   During the conference call, Defendant Goodman repeated Defendant Grewal's false representations about the Company's 2014 end of year trends, stating, in pertinent part, as follows:

We are disappointed by our first-quarter results.  While profitability far exceeded guidance, revenue came up short of our expectations.  We saw trends exiting last year that gave us confidence we would accelerate revenue growth in 2015.  We envisioned this acceleration being driven by continued strong ARPU growth, as well as year-on-year increases in net new customer additions.

151.    Defendant Goodman explained that the Company's 2015 revenue shortfall was due to: (a) lower rates of converting website users to trial customers; (b) a lower-than-expected contribution from Contact Contact's solution providers; and (c) higher customer attrition. Defendants Goodman and Grewal stated that the above-noted dynamics, which would take some time to remedy, would result in approximately $10 million to $13 million in lost 2015 revenue.

152.    Defendant Goodman stated, in pertinent part, as follows:

In this quarter, **we experienced some unexpected dynamics that led to the shortfall in Q1 revenue and drove our reduction in full-year revenue guidance. First, gross customer additions**, while higher than last year, **came in lower than what we had expected.  That was impacted by lower website conversion rates and lower-than-expected contribution from our solution provider channel**.

**Second, attrition rates increased in the quarter, as we experienced higher-than-expected rates of credit card failure, driven by mass distribution of chip-embedded credit cards in the quarter**. As Harp will detail, the cumulative impact of these trends is a reduction in our annual guidance from 17% revenue growth to a 12% to 14% range.

**Speaking first to customer additions, we saw lower conversion rates in the middle of our customer funnel**. Let me start with a quick review of our funnel. The vast majority of our marketing efforts are targeted at driving visitors to our website. Where we then strive to convert those visitors into a free trial of our product. We then convert those free-trial users into paid users.

The first conversion point is visitor-to-trial conversion, the second is trial-to-paying conversion. Simply put, our funnel consists of visitors, trialers, and paying customers. **As we exited last year, we saw strong visitor traffic and positive trends in our ability to convert these visitors to trialers, and ultimately, customers**.

153.    Defendant Goodman then falsely and misleadingly represented that the Company's lower website visitor to trial subscriber conversation rate was due to "mass media and website messaging" associated with Toolkit that "proved a bit too confusing for our prospects." In truth, Constant Contact's Toolkit's website interface was riddled with defects and software bugs, as detailed herein. Defendants knew, or recklessly ignored, that such defects and bugs would result in lower-than-expected customer additions and, consequently, revenue during the 2015. Defendant Goodman falsely and misleadingly represented, in pertinent part, as follows:

In the first quarter, while visitor traffic to our website was generally consistent with our expectations, **we experienced a marked decline in our visitor-to-trialer conversion rate**. This trend offset gains we saw in our ability to convert trialers to paid customers. **Resulting in fewer new customer additions than we had anticipated**.

In hindsight **there are few root causes for the lower visitor-to-trial conversion. Primary among these is that it appears we shifted our mass media and website messaging a little too much towards explaining the breadth of Toolkit**.

This all-in-one message, coupled with an increased emphasis on the various packages, versus value and functionality of the suite, **proved a bit too confusing for our prospects**. Most of whom know us as an email marketing company. We've always been concerned about getting too far ahead of our prospects and customers in our messaging and branding. And we've worked hard to balance this transition.

**It's clear we did not find the right balance with our website experience** as well as our new set of television and radio ads.  **We're working hard to get that right balance, but it's not as simple as flipping a switch** back to a prior set of branding, messaging and website experiences, and then immediately seeing results.  We need to continue to move forward and evolve.

154.   Defendant Grewal then falsely and misleadingly attributed Constant Contact's

customer attrition as being due to credit card failures resulting from the replacement of then existing

credit cards with computer-chip enabled credit cards, stating, in pertinent part, as follows:

As we exited 2014, we've begun to see some improvement in credit card acceptance rates.  In addition, we thought we would be in a position in the first quarter to take advantage of new tools from our credit card processor, so as to further build on this improvement.  However, the reality was that we saw a reversal of some of these trends.  And in addition, after some effort, we found that we could not take advantage of a new tool from our credit card processor, thereby limiting some of the expected gains.  These factors led to higher-than-planned attrition related to credit card failure rates.

**We believe the recent trend is being driven by the replacement of existing credit cards with chip-enabled cards, which most banks will require – will implement by October 2015.  As such, we could continue to face this headwind through most of the year**.

**Recent trends suggest we are losing about 3,500 to 4,000 incremental customers each quarter versus the prior year because of trends in credit cards failure rates.  The cumulative impact of these lost customers over the course of 2015 is about $4 million to $5 million**.

As we flow these trends through the year, this represents about $10 million to $13 million in lost revenue, representing the vast majority of the reduction in our revenue guidance.  While revenue fell short of expectations, the margin profile of the business continues to show strength. Gross margins were 73% in the quarter, up 50 basis points year over year.

155.   During the Q&A session of the conference call, Defendant Grewal noted that

Constant Contact began experiencing website conversion issues in January 2015, stating, in pertinent

part, as follows:

Brad Reback – Stifel Nicolaus – Analyst:

Okay, that's great.  And, last question, **the conversion issue you experienced, when did that start happening in the quarter**?

<u>Defendant Grewal</u>:

So, **we started noticing these trends really late January, but they became more pronounced over the course of February and going into March**. I think one of the things that we had early on was, we found it difficult to diagnose the root cause as we looked to isolate the number of variables, as we looked at the impact on mass media and messaging changing, revisions to packages that we'd made in late December and early January, and how we – how prominent they were on our website.

156.     Analysts inquired about the Company's statements regarding the alleged credit card failures affecting retention rates, as well as the Company's lackluster conversion rate. For example, an analyst asked for the "mechanics" surrounding the alleged credit card failures and its correlation, specifically, to attrition. In response, Defendant Grewal admitted, notwithstanding his false and misleading statements about customer attrition during the 2015 first quarter, that Constant Contact experienced 1,200 to 1,300 incremental customer cancellations during the first quarter of 2015. The following exchange took place:

<u>Steve Ashley – Robert W. Baird & Company, Inc. – Analyst</u>:

And then, I'd just like to ask, on the credit card failures, how are the mechanics there? You try to get someone to renew, the credit card on file doesn't work, you then have to reach out and go through a process of getting the new credit card number. Can you just – is there more attrition with that? Can you walk us through that just a little bit?

<u>Defendant Grewal</u>:

The process is that the vast majority of credit cards that we try go through and historically have. What we've experienced over the course of the last year and accelerated in the first quarter, is that slightly greater percentage of credit cards that we have on file don't – go through the first time.

The process we have is actually to retry over the course of 15 days, 30 days. We work with our credit card processing firm with tools that they have – like count updaters, where they are able to capture the new account number that is then fed back into our system, and we try and capture that.

**What we're finding is that, relative to those set of customers whose credit card we cannot transact with, in Q1, we are finding about 1,200 to 1,300 more, versus last year, that we could not transact with**. When we sent them e-mails, we didn't

get a response and a new credit card put on file.  And so that's the incremental challenge we are facing.

157.   In response to another analyst's question regarding the credit card failures and whether those customers that dropped off would return back to the Company at some point, Defendant Grewal assured:

> **These incremental 1,200 customers that we are losing, versus last year**, the vast majority of them do have some usage with us.  But some of them are episodic.  So, they don't see the need right now, they are not checking their e-mails, some of them work at nonprofits and associations, and maybe we have their e-mail address and they are no longer the right person to contact.  And so we are getting to the person we need to.  We are tracking it, but at this point I do believe that some of these customers will return to us.  But we need to see that trend – we need to see that play out before I can talk to it.

> So, right now, **we can talk to the fact that we do see these customers leaving** and we do see that they are somewhat engaged.  So some of the things we're doing is actually using some analytics in the backdrop to try to understand which customers are still working with us and using us, have logged in, in the last 30, 60, 90 days, and reaching out to them via phone calls.  And we are finding a little bit of success there.

158.   Before the end of the conference call, Defendant Grewal falsely and misleadingly represented that Constant Contact expected to grow its ARPU by 8% during 2015, stating, in pertinent part, as follows:

> Michael Nemeroff – Credit Suisse – Analyst:

> And, again, forgive me if this was asked previously, but on the ARPU lift that you are expecting in 2015, obviously the conversion of existing customers to Toolkit would bring the ARPU.  What's the effect of delaying that transition of the existing base on the ARPU in 2015?

> Defendant Grewal:

> So, I think on the ARPU side, when we went into the year, internally, we were remodeling – we were working within a range for ARPU growth, and it was 8% to 10%.  And, **as we noted in the call, we expect ARPU to grow closer to 8%, so part of that difference between the high and the low end is related to Toolkit migration**.

159. Securities analysts that follow Constant Contact, including Credit Suisse, Barrington Research, and Rosenblatt Securities, downgraded their ratings on Constant Contact common stock citing lower-than-expected new customers and higher-than-expected customer attrition.

160. Following these announcements, the price of Constant Contact common stock plunged more than *21%*, from $34.85 per share on April 30, 2015 to $27.51 per share on May 1, 2015.

161. On May 6, 2015, Constant Contact filed its Form 10-Q for the quarter ended March 31, 2015 ("Q1 2015 Form 10-Q") with the SEC, which was signed by Defendants Goodman and Grewal. The Q1 2015 Form 10-Q contained materially false and misleading MD&A, risk factor disclosures, and internal control disclosure, as well as Individual Defendants' certifications thereon.

**May 13, 2015 Jefferies Global Technology, Media and Telecom Conference**

162. On May 13, 2015, Constant Contact presented at the Jefferies Global Technology, Media and Telecom Conference. During the conference, Defendant Grewal falsely and misleadingly represented that Constant Contact was seeing a "nice ARPU lift," stating, in pertinent part, as follows:

> So I think what we've laid out at Constant Contact is a multi-year strategy of growth initiatives. So obviously one of the core ones that we have is our transformation to all-in-one platform, which we branded internally as Toolkit, don't as actively use that externally, but for these purchases.
>
> **So we believe there's a lot of room there because that's an ARPU play for us** as we have different packages at different price points and people come in at different price points **that we're seeing a nice ARPU lift**.

**June 30, 2015 NASDAQ Investor Program**

163. On June 30, 2015, the last day of the 2015 second quarter, Constant Contact presented at the NASDAQ Investor Program. During the conference, Defendant Grewal falsely and

misleadingly made positive statements about Constant Contact's ARPUs, stating, in pertinent part, as follows:

> **So we have seen a really nice lift in ARPU** because of Toolkit, almost $10 a month higher, on average, than prior to Toolkit, based on people self-selecting into the middle or the higher package.  **And so, that's been a great benefit in terms of driving ARPU**.
>
> The other thing worth mentioning is that the margin profile of all these revenue streams is not created equal.  The margin profile for ARPU and retention is quite different from acquiring new customers.  **So as we drive ARPU, a large percentage of that revenue falls to the bottom line because of the high-margin revenue stream**.  As we get our average customer to stay an extra month, that's a high-margin revenue stream.

### B.    Second Quarter 2015

164.    Then, on July 23, 2015, Constant Contact issued a press release announcing its financial results for the 2015 second quarter, the period ended June 30, 2015.  For the quarter, the Company reported lower than consensus revenue and further reduced its 2015 revenue guidance.  In addition, Constant Contact reported that its ARPU grew less-than-expected during the 2015 second quarter.

165.    After issuing the Company's second quarter 2015 earnings announcement, Constant Contact held a conference call with analysts and investors.  During the conference call, Defendant Grewal announced that two second quarter events were responsible for the lower ARPU reported by the Company.  Notwithstanding their knowledge of these events during the second quarter, Defendants made materially false and misleading representations about the Company's ARPU during the second quarter.

166.    Specifically, Defendant Grewal admitted that the Company made a "conscious choice" during the 2015 second quarter to focus its sales effort on Constant Contact's *lowest* priced email offerings.

167.   In addition, Constant Contact launched its partnership with Endurance and entered into an enterprise relationship agreement with Bloomin' Brands during the second quarter of 2015, each of which have a high percentage of lower ARPU customers.

168.   Defendant Grewal, stated, in pertinent part, as follows:

While **ARPU** grew over 6% year on year, it **was below our target, and makes it more difficult for us to grow to the $50 level we expected by the end of the year**. We had expected to deliver ARPU growth that was $0.20 to $0.30 higher in this quarter.  Based on current trends, we expect ARPU to grow to approximately $49 as we exit this year.

**The revision in ARPU expectations stems from two dynamics**.  **First**, the package mix distribution in the quarter was **skewed more meaningfully toward our lowest priced e-mail package**.  We saw approximately 80% of new customers choosing the e-mail package, quite a bit higher than past quarters.   In the quarter, we de-emphasized package mix, as we refined our positioning with a focus on e-mail marketing as an entry point.

**This was a conscious choice** to focus on customer ads versus package mix, and to find the right future touch points to upgrade some of these customers to the higher-priced packages.  Over time, we would expect the package mix to again skew towards the higher-price packages, and help drive strong gains in ARPU.

**Second in terms of ARPU, while we were excited by deals like Bloomin', as well as customer adds [additions] generated by strategic partnerships, the price points for these deals are lower than direct sales**.  **In the quarter, it was a higher proportion of these lower-ARPU customers.**   While these customers often have lower ARPU, they generally have a meaningfully lower cost of customer acquisition and better retention rates, driving higher customer lifetime value.  The impact weighs on ARPU growth in the near-term, but should be outweighed by medium-term gains in customer lifetime values.

*        *        *

I think what you really saw in Q2 is . . .  **we made a conscious decision to de-emphasize package mix with the intent of driving customer adds [additions]**, we did see more of a skew within our platform going toward the lower-priced packages – almost 80%, which is meaningfully higher.  We've talked about that number being 60% to 70%, and Q2 was 80% or so.  So that was the biggest driver of some of the declines – some of the lack of growth we got in ARPU.

The second piece of it is our success behind some initiatives that we've been investing behind – **strategic partners, enterprise deals,** which historically have shown that they have very good and higher CLTB because ? – and lower cost of

- 60 -

acquisition and higher retention.  And what we saw there is that, that was a larger proportion of our overall customer mix.  That **led to near-term ARPU degradation**.

169.     In addition, during the second quarter earnings conference call, Defendant Goodman acknowledged, albeit cryptically, that Constant Contact's customers had been experiencing difficulties with its website and that it was taking steps to improve the website experience by implementing a new platform referred to internally as "Galileo," stating, in pertinent part, as follows:

> The team is also auditing the entire website experience and the totality of our positioning to help drive a simplified and aligned set of messaging and flows.

> We're increasingly excited about our next-generation authoring platform, internally code-named Galileo.  More than 50,000 customers and trialers are using it, and the feedback to-date has been impressive.  In the coming quarters, all new trialers will be using Galileo, and we'll begin the migration of existing customers to the new platform.

170.     Then, recognizing how much adverse customer experience tarnished the trademark the Company worked so hard to promote, Defendants completely abandoned the Toolkit brand, stating, in pertinent part, as follows:

> [T]he naming convention [T]oolkit has been largely removed from our marketing materials and is being replaced simply with Constant Contact.  While the strategy of an integrated marketing platform will remain front and center, you should not expect to see the [T]oolkit name going forward.

171.     Analysts were not convinced by the Company's rosy portrayal of its reality and warned the market as such.  For example, Credit Suisse published a report on July 23, 2015, entitled "*2Q15 Results Mixed; Transition Still Underway; Neutral*" where it reported, "we believe it could take several qtrs of outperformance before investors regain confidence in the company's ability to resolve current execution issues and resume progress towards management's previously articulated growth target of sustained +20% yr/yr revenue growth."

172.     On this news, the price of Constant Contact common stock declined more than *11%*, from $29.53 per share on July 23, 2015 to $26.18 per share on July 24, 2015, with securities analysts citing less-than-expected ARPU and customer additions for the weakness during the quarter.

## VII.   LOSS CAUSATION

173.     During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Constant Contact securities.  This scheme operated as a fraud or deceit on Class Period purchasers of Constant Contact securities by failing to disclose and misrepresenting the adverse facts detailed herein.   As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Constant Contact securities fell precipitously as the prior artificial inflation came out.

174.     As a result of their purchases of Constant Contact securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Constant Contact securities fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Constant Contact securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

175.     By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Constant Contact's outlook, business, and prospects.  Defendants' false and misleading statements had the intended effect and caused Constant Contact securities to trade at artificially inflated levels throughout the Class Period.

176.     The declines in the price of Constant Contact securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent

misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Constant Contact securities negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic losses, *i.e.*, damages, suffered by Plaintiff and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of Constant Contact securities and the subsequent significant declines in the value of Constant Contact securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   ADDITIONAL ALLEGATIONS REGARDING SCIENTER

177.   The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

178.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Constant Contacts, its operations, and its business practices, and their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Constant Contact, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

179.     As detailed herein, numerous facts support a strong inference of the Individual Defendants' scienter during the Class Period, including:  (a) insider stock sales; (b) the Individual Defendants' intimate knowledge of and participation in the fraudulent scheme alleged herein; (c) the Individual Defendants' own admissions; (d) Defendants' obligations to ensure Constant Contact's disclosure and internal controls during the Class Period were operating effectively; (e) the misstatements and omissions of material facts concerning the Company's core operations on which they repeatedly spoke; (f) the announcement that the SEC has commenced a formal order of investigation into the affairs of Constant Contact and, in particular, that it issued the Company a subpoena seeking documents that relate to some of the issues alleged herein; and (g) Defendants' efforts to deny, downplay, and cover up their fraudulent conduct.

180.     Further, the scienter of Individual Defendants, because of their executive level positions with the Company, can be imputed to Constant Contact.

**A.     Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Price to Profit from Insider Sales of Constant Contact Common Stock**

181.     Defendants Goodman and Grewal were motivated to engage in the fraudulent course of conduct alleged herein to allow them to collectively sell more than 174,000 shares of their personally held Constant Contact common stock for gross proceeds of approximately $6.8 million during the Class Period,[3] as follows:

| Name | Title | Date | Shares Sold | Price | Proceeds |
| --- | --- | --- | --- | --- | --- |
| Goodman, Gail F. | CEO | 11/14/2014 | 5,000 | $34.50 | $172,500 |
| | | 12/1/2014 | 5,000 | $32.04 | $160,200 |
| | | 12/8/2014 | 20,000 | $35.00 | $700,000 |
| | | 1/2/2015 | 15,000 | $36.78 | $551,700 |

---

[3]     Further, Ellen Brezniak, Senior Vice President of Customer Support, who had access to and was aware of the various customer service and sales metrics that were being tracked and reported (*see* ¶ 82, *supra*), sold 37,500 shares for gross proceeds of approximately $1.2 million.

| | | | | | |
|---|---|---|---|---|---|
| | | 2/4/2015 | 10,000 | $38.77 | $387,700 |
| | | 2/4/2015 | 15,000 | $40.00 | $600,000 |
| | | 3/2/2015 | 25,000 | $41.65 | $1,041,250 |
| | | 4/1/2015 | 5,000 | $37.90 | $189,500 |
| | | **TOTAL** | 100,000 | | $3,802,850 |
| | | | | | |
| Grewal, Harpreet | CFO | 2/24/2015 | 43,374 | $41.54 | $1,801,756 |
| | | 2/25/2015 | 18,476 | $42.02 | $776,362 |
| | | 2/26/2015 | 9,699 | $42.03 | $407,649 |
| | | 4/9/2015 | 2,750 | $39.40 | $108,350 |
| | | **TOTAL** | 74,299 | | $3,094,116 |
| | | | | | |
| ***Total*** | | | ***174,299*** | | ***$6,896,696*** |

**B.** **The Individual Defendants were Intimately Involved in and Had Knowledge of the Fraudulent Scheme Alleged Herein**

182.    As noted herein, numerous FEs of Constant Contact noted that they were instructed in periodic meetings with senior management to deceptively delay customer account cancellations.  In fact, FE 1 stated "a member of Senior Management" told him that "they purposely kept accounts active until the next year [2015] to artificially inflate the numbers."

183.    FEs of the Company also noted that they were "disgusted" with the Company's business practices, calling them "morally wrong" and "unethical."  In fact, one FE stated that Constant Contact was able to report favorable retention rates during the Class Period "because of our manipulation."  In addition, an FE stated Constant Contact's Finance Group would arbitrarily apply credits to customer accounts during the Class Period so that they would appear as active customers.  Corporate actions such as these could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of personnel at the highest levels of the Company, including Defendants.

184.    Moreover, Defendants ***knew*** the explanations they provided to investors for the high number of customer cancellation requests during the Class Period were materially false and

misleading.  While Constant Contact may have experienced credit card failures during the Class Period, in truth and in fact, FEs principally credit dissatisfaction with Toolkit as the primary reason why the Company was inundated with customer cancellation requests during the Class Period.

185.    Indeed, Defendants knew Toolkit was the true reason for the large number of customer cancellations because it was the Company's practice to be informed as to exactly why customers cancelled their subscriptions.  In fact, FE 7 noted Constant Contact tracked all customer-related interactions, including telephone calls and computer chats, as well as the time spent during such interactions.  In this regard, FE 7 stated, "I can't think of anything that we didn't track."

### C.    Defendants' Own Statements Support Scienter

186.    Defendants' scienter is also supported by their own statements acknowledging that they closely monitored, evaluated, and tested Toolkit throughout the Class Period.  For example, Defendant Goodman boasted to investors:  "***we do have an incredible amount of data*** and are able to see [Toolkit] engagement from trial engagement through customer engagement, from first campaign through ongoing usage.  We are really pleased with the Toolkit engagement."

187.    On the Company's October 23, 2014 earnings call, Goodman stated that "[a]t this point, there are tremendous learnings, constant testing, iterating, and refinements" regarding Toolkit and "[w]e're seeing better customer engagement, higher ARPU, improving retention rates, and increased lifetime customer revenue from Toolkit customers."  Goodman also acknowledged closely monitoring Toolkit's effects on different audiences:  "We are still maintaining a flow of traffic to our standalone offerings really in order to maintain a control so we understand the impact of Toolkit, to evaluate the effects of Toolkit on different audiences, and to optimize our results.  So you could be easily seeing that standalone experience or the Toolkit experience, but really not presenting an option to the customer, but really bringing people in on incrementally separate paths so we can fully optimize our funnel."  She added that "depending on how you find us you may end up in a varying

test cell and you might see either of the standalone products or Toolkit.  And you're right, those are at different price points."

188.    An analyst on the October 23, 2014 earnings call asked Defendant Goodman about customers' use of Toolkit versus email marketing.  Goodman refused to "share" those details, but admitted the Company was being "very thoughtful about what audiences are seeing what." Goodman indicated that the decision to implement Toolkit was carefully vetted by Defendants, based on their target audiences and "our testing and iterating objectives."  More specifically, she disclosed that the Company's "solution provider audience, which is one of our leading growth channels, [was] 100% Toolkit.  They are learning how to sell and implement that on behalf of their customers and really loving that."  She added that audiences further from the core, like international audiences, were skewed "a little more heavily towards the standalone products as we want to learn and tune in our core market in the US."

189.    Concerning customer retention, Defendant Grewal told investors that Constant Contact possesses powerful computer analytics that assign retention scores to "every customer" on "a daily basis" and that such analytics were sophisticated enough to predict customer cancellations at varying intervals during a given 90-day period.  Armed with these analytics, Defendant Grewal touted the Company's improving customer retention rates at the January 13, 2015 Needham Growth Conference.  Just days later, however, when the Company announced its 2014 results on January 29, 2015, Defendant Grewal stated the Company's retention rates declined during 2014.

190.    In addition, during the first quarter of 2015, Defendant Grewal spoke about the underlying foundation of customer retention being "quite strong."   When Constant Contact announced its 2015 first quarter results, however, Defendant Grewal admitted that the Company experienced a 1,100 to 1,300 increase in customer cancellations during the 2015 first quarter.

191.    Finally, during the 2015 second quarter, Defendants falsely and misleadingly represented that Constant Contact was seeing a "nice ARPU lift" and spoke about how Toolkit was "driving ARPU."  When the Company announced its second quarter earnings however, Defendants admitted that two events were causing a "near-term ARPU degradation."

192.    First, Defendant Grewal admitted that the Company made a "conscious choice" during the 2015 second quarter to focus its sales effort on Constant Contact's lowest priced email offerings.   Second, Defendants admitted that Constant Contact launched its partnership with Endurance and entered into an enterprise relationship agreement with Bloomin' Brands during the second quarter of 2015, each of which have a high percentage of lower ARPU customers.

193.    Accordingly, Defendants knew, or recklessly ignored, that their above-noted representations to investors during the Class Period were materially false and misleading.

### D.    Defendants' Misstatements Concerning the Company's Core Operations Support Scienter

194.    Plaintiff alleges that the known, but undisclosed, adverse facts alleged herein during the Class Period can be imputed to the Individual Defendants who, as high-level executive Company officers (CEO, CFO, and Vice President of Investor Relations), knew or recklessly ignored facts related to Constant Contact's core operations.

195.    Indeed, the significance of Toolkit is highlighted in the Company's disclosed business strategy "to expand beyond email marketing to provide" the market place with the integrated multi-product, Toolkit.

196.    The importance of Toolkit to Constant Contact's core business operations was further evidenced by the Individual Defendants' numerous public statements about Toolkit throughout the Class Period, as detailed above.  For example, on December 2, 2014, Defendant Goodman said the Company was "definitely on a transition from [an] email marketing single-product company to

multi-product to shop for."  She added that 20% of the Company's revenue was coming from sources outside of email marketing and "[a] lot of that is starting to be Toolkit."  In particular, she touted the impact of this transition on the Company's critical ARPU metric:  "So, we've now brought all the products we have, some single-platform together under Toolkit.  And so new customers, a little over half of those are coming in on Toolkit today, and that's coming in at a higher ARPU as well."  As another example, on March 4, 2015, Defendant Sisitsky told investors that Toolkit "is really the future of Constant Contact."

### E.   SEC Scrutiny During the Class Period Further Supports Scienter

197.   The SEC's formal investigation of Constant Contact is also probative of scienter. After the end of the Class Period, on December 15, 2015, Constant Contact disclosed that the SEC had commenced a formal order of investigation into the affairs of Constant Contact and, in particular, issued it a subpoena seeking documents relating to some of the same issues alleged herein.

### F.   Defendants' Repeated Attempts to Deny, Downplay, and Cover Up Their Fraudulent Conduct Establish Scienter

198.   Defendants' deceptive practices to create the false impression that Toolkit had been successfully received in the marketplace and their desperate campaign of misinformation in an attempt to save what they considered to be the "future of Constant Contact" also establishes their scienter.

199.   During the Class Period, Defendant Goodman called Toolkit a "game changer for small businesses" that would define "the future of small business marketing."  Indeed, while Defendants were reassuring investors about how well Toolkit was performing and how well it was being embraced in the marketplace, unbeknownst to investors, they were taking measured steps to conceal its failings.  These measured steps included:  (a) the deployment of a Company-wide

practice to deceptively understate customer cancellations; (b) falsely attributing Toolkit-related customer cancellation to credit card failures; and (c) taking unprecedented actions to boost revenue in the short-run and falsely attributing such revenue increases to Toolkit.

## IX.    PRESUMPTION OF RELIANCE

200.    Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for Constant Contact's publicly traded common stock was open, well-developed, and efficient at all times.  As a result of Defendants' materially false and misleading statements, Constant Contact's publicly traded common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Constant Contact's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Constant Contact, and have been damaged thereby.

201.    At all relevant times, the market for Constant Contact's securities was an efficient market for the following reasons, among others:

(a)    Constant Contact common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Constant Contact regularly made public filings with the SEC, including its Forms 10-K and 10-Q, and related press releases;

(c)    Constant Contact regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Constant Contact was followed by securities analysts employed by brokerage firms, such as Oppenheimer, Canaccord Genuity, and Deutsche Bank, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

202.     As a result of the foregoing, the market for Constant Contact common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Constant Contact common stock.

203.     Under these circumstances, all purchasers of Constant Contact publicly traded common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices.  As a result, a presumption of reliance applies.

204.     At the times they purchased or otherwise acquired Constant Contact's publicly traded common stock, Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the presumption of reliance applies.

205.     In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations during the Class Period;

(b)     the misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's publicly traded common stock; and

(e)     Plaintiff and the other members of the Class purchased the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that such facts were misrepresented.

206.    Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which Defendants had a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding, *inter alia*, the true nature of Constant Contact's business operations.

## X.      NO SAFE HARBOR

207.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

208.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Constant Contact who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in

the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.    CLASS ACTION ALLEGATIONS

209.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Constant Contact securities between July 25, 2014 and July 23, 2015, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Constant Contact's securities were actively traded on the NASDAQ.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.  As of June 30, 2015, Constant Contact had 32.2 million common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Constant Contact or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

212.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

213.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

214.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)    whether the market prices of Constant Contact's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE
### EXCHANGE ACT AND RULE 10b-5 PROMULGATED
### THEREUNDER AGAINST ALL DEFENDANTS

215.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company securities during the Class Period.

218.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Constant Contact securities.  Plaintiff and the Class would not have purchased Constant Contact securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

219.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Constant Contact securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE
### EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

220.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

221.    The Individual Defendants acted as controlling persons of Constant Contact within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers and/or directors of Constant Contact, and/or their ownership of Constant Contact securities, the Individual Defendants had the power and authority to, and did, cause Constant Contact to engage in the wrongful conduct alleged.

222.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Constant Contact securities during the Class Period.

223.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

(a)    Declaring that this action is a proper class action and certifying Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel for the proposed Class;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 19, 2016          ROBBINS GELLER RUDMAN & DOWD LLP

                       s/ JACK REISE
                       ————————————————

JACK REISE (*pro hac vice*)
STEPHEN R. ASTLEY (*pro hac vice*)
ELIZABETH A. SHONSON (*pro hac vice*)
SABRINA E. TIRABASSI
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
stirabassi@rgrdlaw.com

SAMUEL H. RUDMAN
MARK T. MILLKEY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
617/449-4900 (fax)
srudman@rgrdlaw.com
mmillkey@rgrdlaw.com

*Lead Counsel for Plaintiff*

ALAN L. KOVACS (BBO No. 278240)
257 Dedham St.
Newton, MA  02461
Telephone:  617/964-1177
617/332-1223 (fax)
alankovacs@yahoo.com

*Liaison Counsel*

- 77 -

SUGARMAN & SUSSKIND
ROBERT A. SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)
sugarman@sugarmansusskind.com

*Additional Counsel for Plaintiff*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 19, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Court's Electronic Mail Notice List, and I hereby certify that I have caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Court's Manual Notice List.

s/ JACK REISE